[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 19, 2011
JOHN LEY
CLERK

No. 09-12513

_____

D. C. Docket Nos. 99-02054-CV-T-30-TGW,
95-00311-CR-T-3

EZELL GILBERT,

Petitioner-Appellant,

versus

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 19, 2011)

Before DUBINA, Chief Judge, and TJOFLAT, EDMONDSON, CARNES, BARKETT, HULL, MARCUS, PRYOR, MARTIN, HILL, and BLACK, Circuit Judges.[*]

_____

[*] Judge Charles R. Wilson recused himself and did not participate in this decision. Judge James C. Hill elected to participate in it pursuant to 28 U.S.C. § 46(c)(1), and Judge Susan H. Black elected to continue to participate pursuant to 28 U.S.C. § 46(c)(2).

CARNES, Circuit Judge:

Ezell Gilbert, a federal prisoner, wants to have an error of law in the calculation of his sentence corrected based upon a Supreme Court decision interpreting the sentencing guidelines, even though that decision was issued eleven years after he was sentenced. Gilbert insists that prisoners have a right to have errors in the calculation of their sentences corrected no matter how long it has been since the sentences were imposed. His insistence calls to mind Justice Holmes' observation that "All rights tend to declare themselves absolute to their logical extreme." Hudson Cnty. Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 531 (1908). But as Holmes also explained in the same thought, "Yet all [rights] in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached." Id.

The principles of policy that limit the right to be resentenced in accord with the latest guidelines decisions are those regarding finality of judgment and the important interests that finality promotes. For reasons we will discuss, the statutory provisions and the decisions furthering finality of judgment are strong enough to hold their own against Gilbert's claimed right to have a long-ago error in calculating his sentence corrected.

2

In more technical terms, we granted rehearing en banc in this case to decide whether the savings clause contained in 28 U.S.C. § 2255(e) permits a federal prisoner to challenge his sentence in a 28 U.S.C. § 2241 petition when he cannot raise that challenge in a § 2255 motion because of the § 2255(h) bar against second and successive motions. The primary question, in plainer English, is whether a federal prisoner can use a habeas corpus petition to challenge his sentence. Our answer is "no," at least where the sentence the prisoner is attacking does not exceed the statutory maximum.

## I. BACKGROUND

The facts underlying the sentence in this case, and the procedural history, illuminate the issue and the competing considerations that we consider in deciding it.

### A. Gilbert's Crime and Criminal History

On October 11, 1995, Ezell Gilbert set off for a day of work, plying his trade near the Cottage Hills Housing Project, a high crime area of Tampa, Florida. That day Gilbert was working out of his car, a four-door 1985 Chevrolet Celebrity. He was a drug dealer, and two officers of the Tampa Police Department, who were hidden from view, were conducting surveillance of illegal activity in the area.

Around 9:30 a.m. the officers spotted Gilbert as he stopped his car and

3

allowed a man to enter it. Once inside, the man appeared to give money to Gilbert in exchange for some rocks of crack cocaine. The officers then saw the man exit the car as he counted the rocks he had bought. A short time later, the officers saw another man enter Gilbert's car and engage in another drug deal with him. At that point, the officers conducting surveillance notified a patrol car that was a few blocks away and provided the car's license plate number. The officers in the patrol car discovered through a computer check that the plate number was assigned to a different make and model car. By this time Gilbert was on the move, driving in the direction of the patrol car, which was at a nearby intersection. The officers in the patrol car trailed Gilbert's vehicle for about a block before it turned into the parking lot of a convenience store. When the officers approached Gilbert's car, he tried to flee on foot but they stopped him.

The officers discovered that Gilbert had not been alone in the car. In a drug dealer's version of "Bring Your Daughter to Work Day," Gilbert had brought his five-year-old daughter, Keidra, along with him as he plied his trade. She had been seated in the back seat of the small car the whole time. She was there as two drug addicts climbed into the car to buy drugs from Gilbert, and he left her there as he attempted to run away from the approaching officer.

When police demanded to see the car's registration, Gilbert reluctantly

4

opened the glove compartment. A clear plastic bag containing what appeared to be crack cocaine fell out into his hand and into plain view. Shoving it back in the compartment, Gilbert told police that "nothing" was in the bag. At that point the police placed him under arrest and started to search the car. As the officers did so, Gilbert exclaimed, "[T]he car ain't mine; I don't know what's in that car."

What was in that car, in addition to Gilbert's young daughter, was the bag that had fallen from the glove compartment. It contained 67 grams of crack cocaine, and there was a smaller bag containing 2 grams of powder cocaine in the glove compartment. And there were also 40 "ring baggies" containing a total of 111 grams of marijuana stashed under the car's front seat.

The record does not reveal whether that day was the first time that Gilbert had taken his five-year-old daughter into harm's way with him as he committed crimes, but it does reveal that this was not the first time he had committed crimes. Gilbert's known criminal history began in 1989, when he was only 19 years old. In March of 1989 he was arrested on state charges for possession of cocaine and possession of alcohol by a minor, but those charges were dropped. Two arrests followed in May 1989 for possession of alcohol by a minor, but the State evidently did not pursue the charges.

Gilbert soon graduated to more serious crimes. In September 1989, while

5

still 19 years old, he was arrested for striking a police officer who had been attempting to detain him for battery on a female. It appears from the record that Gilbert was later convicted for battery and obstructing or opposing officers without violence in connection with that incident, and he was sentenced to an unspecified amount of time served. Also in September of 1989, Gilbert was arrested and charged with two state felonies: possession of cocaine with intent to sell or distribute and carrying a concealed firearm (a shotgun was found under the car seat). In January of 1990, at age 20, he was sentenced to three years probation on both counts, with formal adjudication withheld pending his successful completion of probation.

Instead of successfully completing probation, however, Gilbert chose to commit more crimes. As a result, a probation violation notice was filed on March 2, 1990, and a few days later Gilbert was arrested and charged with more state crimes, including possession of cocaine. He was convicted of the new cocaine charge on March 29, 1990, and on that date received a sentence of 2 years of community control.

Seventeen days later, on April 16, 1990, state authorities filed yet another notice that Gilbert had violated the terms of the probation that had been imposed on him just three months earlier. On June 6, 1990, he was found to have violated

6

his probation and as a result was adjudicated guilty on the January 1990 crimes of possession of cocaine with intent to sell or distribute and carrying a concealed firearm. He was sentenced to 30 months imprisonment for those two crimes. On or about that same date, Gibert also received the same sentence on the March 7, 1990 charge of possession of cocaine. Those sentences were imposed when Gilbert was 20.

How much time Gilbert actually served is unclear, but it certainly was not 30 months. By October 24, 1991, only 17 months after he had been sentenced, the 21-year-old Gilbert was free again, a fact we know because he was arrested on that date for possession of marijuana. Gilbert was convicted of that marijuana charge and on January 28, 1992, at age 22, he received yet another sentence of probation, this time for one year. Less than two months later, yet another probation violation notice had been filed, and in August of 1993, when Gilbert was 23, he was arrested yet again, this time on two counts of possession of marijuana with intent to sell or distribute. The State filed an "order of release" as to both those charges on September 8, 1993, but in what may have been a related action, on September 14 Gilbert was sentenced to one year imprisonment on the 1991 marijuana charge. He was then 23 years old.

Gilbert once again did not serve his full time in prison; instead, he was

7

released on January 8, 1994, just four months into his one-year term. And once again, it was not long before Gilbert was caught committing another crime. That September, an officer who had stopped him for a traffic violation spotted a handgun next to Gilbert's right leg, and a search of his car revealed 22.3 grams of crack cocaine. For some reason Gilbert, then age 24, was charged only with carrying a concealed firearm and being a felon in possession of a firearm. On December 19, 1994, shortly after he had turned 25, Gilbert was sentenced to three years probation for each crime. And true to form, Gilbert did not successfully complete his probationary period. Instead, he violated it when he committed the drug crimes involved in this case on October 11, 1995, about a month before he turned 26. This time he would not be treated leniently.

The State of Florida charged Gilbert with trafficking in cocaine, possession of marijuana, possession of drug paraphernalia, and child abuse, all in connection with his October 11, 1995 arrest. The child abuse charges stemmed from Gilbert's having his daughter with him while he was dealing drugs. All of those state charges, however, were nolle prossed in January 1996, in deference to the federal indictment of Gilbert for that same illegal drug conduct.

## B. Gilbert's Indictment, Conviction, and Sentencing

The indictment of Gilbert in December 1995 included one count of

8

possession of crack cocaine with intent to distribute and one count of possession of marijuana with intent to distribute. The government filed a timely 21 U.S.C. § 851 notice of the prior drug convictions that it intended to rely on in seeking an enhanced statutory penalty range under 21 U.S.C. § 841(b)(1)(A). That notice listed three of Gilbert's prior convictions: his March 1990 conviction for possession of cocaine; his June 1990 conviction for possession of cocaine with intent to sell or distribute; and his January 1992 conviction for possession of marijuana. Given the quantity of crack cocaine that Gilbert was charged with possessing with intent to sell, even without any of his prior convictions he faced a statutory range of ten years to life on that count. See 21 U.S.C. § 841(b)(1)(A) (1996) ("In the case of a violation of subsection (a) of this section involving . . . 50 grams or more of a mixture or substance . . . which contains cocaine base . . . such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life.") With any two of his three prior convictions listed in the § 851 notice, however, Gilbert faced a mandatory sentence of life imprisonment (without parole) on that count. See id. ("If any person commits a violation of this subparagraph . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release . . . ."). On the second count, involving possession

9

with intent to sell marijuana, without any prior convictions Gilbert would have faced a sentence of not more than five years. See 21 U.S.C. § 841(b)(1)(D) (1996). With one or more prior convictions for a felony drug offense he faced a sentence of not more than ten years on that count. See id.

After Gilbert's motion to suppress was denied, he pleaded guilty in March of 1996. At the plea hearing, Gilbert admitted possessing with intent to distribute more than 50 grams of crack cocaine and more than 100 grams of marijuana. Given the prior drug convictions listed in the § 851 notice, none of which Gilbert ever denied, his guilty plea should have subjected him to a mandatory life sentence. See 21 U.S.C. § 841(b)(1)(A) (1996). But Gilbert pleaded guilty to the indictment "as originally charged without the enhancement," meaning without "the [§] 851 enhancement." The government did not object to Gilbert's statement that the statutory enhancement would not be applied, and the non-application of it obviously was part of a plea agreement.[1]

_____

[1] The PSR states, "[t]here is no plea agreement in this case," but the record shows that there was an agreement that Gilbert would be sentenced without the statutory enhancement. A defendant cannot escape the effect of a § 851 notice and the resulting enhanced penalty ranges set out in § 841(b)(1) without the government's agreement. The United States Attorneys' Manual provides that the government may waive or withdraw a § 851 notice as part of a plea agreement so long as its action is made known to the sentencing judge. See Dep't of Justice, United States Attorneys' Manual § 9-27.300(B) cmt. (1997). Here the fact that the statutory enhancement notice was being withdrawn obviously was made known to the judge, because the judge was the first one to note at the plea hearing that Gilbert was pleading guilty without the enhancement.

10

Gilbert was sentenced on March 25, 1997. Because the government waived the § 851 notice of prior convictions, his statutory sentencing range was ten years to life imprisonment on the crack distribution count and not more than five years on the marijuana distribution count. See 21 U.S.C. §§ 841(b)(1)(A), (D) (1996). Gilbert's base offense level was 32 because his distribution offense involved at least 50 grams but less than 150 grams of crack. See U.S.S.G. § 2D1.1(a)(3), (c)(4) (1995). There were no adjustments for specific characteristics of the offense, characteristics of the victim, the defendant's role in the offense, or obstruction of justice.

Gilbert was sentenced as a career offender under § 4B1.1 based on two convictions: his June 1990 conviction for possession of cocaine with intent to sell, which was counted as "a controlled substance offense," and his December 1994

---

That part of the colloquy went as follows:

The Court: "I understand that you're pleading guilty to the indictment as originally charged without the enhancement; is that correct?"

Defendant: "Yes, sir."

[Defense Attorney]: "That's the 851 enhancement."

The Court: "The 851 enhancement."

At the sentence hearing, Gilbert's attorney stated, without objection from the government, that: "[O]n page one of the sentencing memorandum, they have the mandatory minimum of life, which is no longer applicable in this case, it's a ten-year mandatory minimum." And the Addendum to the PSR states: "The government has indicated that the enhancement in this case for a Life sentence was withdrawn at the time of the defendant's plea."

11

conviction for carrying a concealed weapon, which was counted as a "crime of violence." See id. § 4B1.1 (1995). Although Gilbert's long criminal record included other drug charges, some of them had resulted in convictions for possession instead of distribution while a few had not resulted in convictions.[2] As a result, Gilbert had only one prior conviction that met the guidelines definition of "a controlled substance offense." See id. § 4B1.2(b) (defining "controlled substance offense" to mean a felony that involves the manufacture, import, export, distribution, or dispensing of a controlled substance or possession with intent to do so).[3] That conviction and the one for carrying a concealed weapon were the two that led to his being treated as a career offender under § 4B1.1. Because he was treated as a career offender, Gilbert's offense level was increased from 32 to 37. See id. § 4B1.1(b)(A) (providing for an offense level of 37 where a career offender's current offense provides a maximum penalty of life imprisonment).[4]

_____

[2]The 1990 conviction on the cocaine charge was listed in the § 851 notice, while the 1994 carrying a concealed weapon conviction was not. The reason is that the § 851 requirement applies only to drug convictions used to enhance the statutory range under § 841(b)(1); it does not apply to controlled substance or crime of violence convictions used to obtain § 4B1.1 enhancements under the guidelines. See Young v. United States, 936 F.2d 533, 536 (11th Cir. 1991).

[3]At the time of Gilbert's sentencing, the guidelines definition of a "controlled substance offense" was contained in § 4B1.2(2) (1995). Although that provision has since been renumbered § 4B1.2(b) (2009), the content has not changed.

[4]At the time of Gilbert's sentencing, the guidelines provision containing the substituted offense level for a career offender whose current offense carried a statutory maximum penalty of life imprisonment was contained in § 4B1.1(A) (1995). Although that provision has since been

12

Gilbert was given a two-point downward adjustment for acceptance of responsibility, see id. § 3E1.1(a) (1995), bringing his adjusted offense level to 35. His criminal history category would have been V,[5] but the career offender provision raised it to VI because of the § 4B1.1 enhancement. See id. § 4B1.1(b).[6] The result was a guidelines range of 292 to 365 months.

If the § 4B1.1 career offender enhancement had not applied, Gilbert's base offense level would have been 32 minus 2 levels for acceptance of responsibility, resulting in an adjusted offense level of 30. His criminal history category would not have been increased from level V, and the guidelines range would have been 151 to 188 months.

Gilbert objected on a number of grounds at sentencing, the only relevant one for present purposes being his objection to career offender treatment under the guidelines. He did not dispute that his prior conviction for possession of cocaine with intent to distribute was a "controlled substance offense," but he did contend

---

renumbered § 4B1.1(b)(A) (2009), the content has not changed.

[5] Gilbert had a criminal history score subtotal of 7 before two points were added because he had been on probation at the time he committed these offenses, see U.S.S.G. § 4A1.1(d) (1995), and one point was added because he committed these offenses within two years of his release from custody in 1994 for possession of marijuana, see id. § 4A1.1(e) (1995).

[6] At the time of Gilbert's sentencing, the guidelines provision mandating that a career offender's criminal history category should be VI was contained in § 4B1.1 (1995). Although that provision has since been renumbered § 4B1.1(b) (2009), the content has not changed.

13

that his prior conviction for carrying a concealed weapon was not a "crime of violence." In rebutting his objection, the government relied on United States v. Hall, 77 F.3d 398, 401–02 (11th Cir. 1996), which held that a conviction for carrying a concealed weapon was a "violent felony" for purposes of § 4B1.4 (the armed career criminal enhancement applicable in felon-in-possession cases). See United States v. Oliver, 20 F.3d 415, 418 (11th Cir. 1994) ("Precisely the same analytical framework applied by the courts in ascertaining the scope of a 'crime of violence' [under the career offender guideline] logically obtains with respect to the question of what kind of conduct comprises a 'violent felony' [under the Armed Career Criminal Act (ACCA)].").

The district court overruled all of Gilbert's objections and sentenced him on March 25, 1997. Acting under the then-mandatory guidelines system, the district court sentenced Gilbert to 292 months imprisonment on the intent to distribute crack cocaine count after the judge made it abundantly clear that he would have preferred to give Gilbert a shorter term of imprisonment. The court also sentenced Gilbert to 120 months imprisonment on the intent to distribute marijuana count, to run concurrently.

## C. The Post-Sentencing Procedural History

On direct appeal Gilbert raised three issues, one of which was his contention

14

that carrying a concealed weapon was not a "crime of violence," as defined in § 4B1.2(a), for § 4B1.1 purposes.[7]  See United States v. Gilbert, 138 F.3d 1371, 1372 (11th Cir. 1998) (Gilbert I).  This Court rejected his argument and concluded that carrying a concealed weapon "presents a serious potential risk of physical injury," within the meaning of § 4B1.2(a)(2).  Gilbert I, 138 F.3d at 1372.  We denied Gilbert's petition for rehearing and rehearing en banc, United States v. Gilbert, 156 F.3d 188 (11th Cir. 1998) (unpublished table decision), which raised the issue, and the Supreme Court denied his petition for a writ of certiorari, Gilbert v. United States, 526 U.S. 1111, 119 S.Ct. 1754 (1999) (mem.), which also raised it.

In September of 1999 Gilbert filed pro se a 28 U.S.C. § 2255 motion raising a number of claims, none of which reiterated the contention he had already made at sentencing and on appeal that the § 4B1.1 career offender enhancement guideline should not have been applied in his case.  The district court denied his § 2255 motion in July 2003.[8]  That court also denied Gilbert a certificate of appealability,

_____

[7]At the time of Gilbert's sentencing, the guidelines definition of a "crime of violence" was contained in § 4B1.2(1) (1995).  Although that provision has since been renumbered § 4B1.2(a) (2009), the content has not changed.  To avoid confusion, throughout this opinion we refer to the current enumeration, § 4B1.2(a).

[8]Between the filing of the § 2255 motion and the ruling on it, the case was reassigned to a different judge, and there was some confusion about the pleadings, and Gilbert fired his attorney, and the new district court judge recused himself, and the third judge referred the matter to a magistrate judge, and so on.  As a result, it took four years for Gilbert's § 2255 motion to be decided.

15

and in June 2004 we did too.

There the matter was laid to rest, and there it rested until a series of events beginning in August 2008 led to its being exhumed. The United States Sentencing Commission had published Amendment 706 on November 1, 2007, which provided for a two-level reduction in base offense levels for crack cocaine offenses. U.S.S.G. App. C, amend. 706 (Supp. 2007). That amendment, which was made retroactively applicable by Amendment 713 on March 3, 2008, allowed prisoners serving time for crack cocaine offenses to receive a reduction in their sentences. Id.; U.S.S.G. App. C, amend. 713 (Supp. 2008).

On August 26, 2008, the district court on its own initiative issued an order directing the Federal Public Defender to represent Gilbert in an 18 U.S.C. § 3582(c)(2) proceeding before the court to determine whether he was entitled to have his sentence reduced under Amendment 706. The court also ordered the Probation Office to file a supplemental report in the case. After hearing from the Federal Public Defender and the United States Attorney's Office, the court issued an order on January 21, 2009, concluding that Gilbert was not entitled to relief under Amendment 706. The court reasoned that while Amendment 706 did reduce Gilbert's base offense level, it did not "have the effect of lowering the applicable sentencing guideline range because the career offender guideline, not the crack

16

guideline, was applied at sentencing." The court also briefly addressed and rejected the possibility of granting Gilbert relief under 28 U.S.C. § 2255 or § 2241.

Gilbert then filed through counsel what he styled a "Motion to Reopen and Amend First 28 U.S.C. § 2255 Motion" on January 28, 2009. See Gilbert v. United States, 609 F.3d 1159, 1162 (11th Cir. 2010) (Gilbert II). That motion asserted the claim that the sentencing court's application of the § 4B1.1 career offender guidelines enhancement had been error, which was the same claim that we had rejected 11 years before in our Gilbert I decision on direct appeal. As Gilbert pointed out, however, in the intervening years his position that he should not have been treated as a career offender had been vindicated. The Supreme Court had issued Begay v. United States, 553 U.S. 137, 128 S.Ct. 1581 (2008), holding that the offense of driving under the influence was not a "violent felony" within the definition contained in 18 U.S.C. § 924(e)(2)(B)(ii), an ACCA enhancement provision. 553 U.S. at 148, 128 S.Ct. at 1588. And we had then extrapolated from that decision to hold in United States v. Archer, 531 F.3d 1347, 1352 (11th Cir. 2008), that carrying a concealed firearm was not a "crime of violence," as defined in § 4B1.2(a) for purposes of the § 4B1.1 career offender enhancement. In Archer, we concluded that Begay had effectively overruled our holding in Gilbert I. See

17

Archer, 531 F.3d at 1352.[9]

The problem for Gilbert was that his Archer-based claim clearly was barred by the Antiterrorism and Effective Death Penalty Act of 1996's (AEDPA's) second and successive petitions provision, 28 U.S.C. § 2255(h). By styling his pleading as one to reopen the § 2255 motion that he had filed more than 9 years before, Gilbert was attempting to avoid that statutory bar. The government opposed that specific attempt and Gilbert's motion in general.

Gilbert urged on the district court "two vehicles" by which it could grant him relief. He argued that the court could construe his motion as one under Fed. R. Civ. P. 60(b)(5) and (b)(6) to reopen and revisit its original order denying his initial 28 U.S.C. § 2255 motion. In the alternative, Gilbert argued that the court could treat his motion as one for relief under 28 U.S.C. § 2241 on the theory that the savings clause of § 2255(e), as interpreted in Wofford v. Scott, 177 F.3d 1236 (11th Cir. 1999), permitted it. See 28 U.S.C. § 2255(e).

The district court rejected both arguments. It concluded that Gilbert's 60(b) argument was foreclosed by the reasoning in Gonzalez v. Crosby, 545 U.S. 524,

---

[9]This was the series of events the district court had in mind when, denying Gilbert § 3582(c) relief, it commented: "Unfortunately, Mr. Gilbert is in the unenviable position of having to remain in prison even though under the present interpretation of the law he is no longer deemed a career offender and has served the time that would be required of him were he sentenced today."

18

125 S.Ct. 2641 (2005), which held that Rule 60(b) could not be used to bring a claim in a 28 U.S.C. § 2254 petition that would otherwise be prohibited by the § 2244(b) bar against second or successive petitions. See Gonzalez, 545 U.S. at 530–32, 125 S.Ct. at 2647–48. The district court also rejected Gilbert's argument based on the savings clause in § 2255(e), concluding that his claim that the sentencing guidelines had been misapplied when he was sentenced 13 years before did not meet the requirements of our Wofford decision.

A panel of this Court reversed the district court's denial of relief. See Gilbert II, 609 F.3d at 1168. Without addressing the Rule 60(b) issue, the panel decided that the savings clause contained in § 2255(e) authorized Gilbert to bring his Begay/Archer claim in a § 2241 petition notwithstanding (or perhaps because of) the § 2255(h) bar on second or successive motions. Id. at 1165–68. We granted rehearing en banc, Gilbert v. United States, 625 F.3d 716 (11th Cir. 2010), and now affirm the district court's denial of relief.

## II. DISCUSSION

Gilbert's savings clause contention requires much more discussion than his Rule 60(b) one, so we will address it first. Before doing that, however, we need to address some assumptions the parties make that relate to the issues we will be deciding.

19

## A. Assumptions About the Effect of the Error
## in Calculating Gilbert's Sentence

Gilbert's arguments presume that if <u>Begay</u> and <u>Archer</u> had been on the books when his case arose he would have received a lighter sentence because the career offender enhancement, which those decisions rule out for his case, did increase his mandatory guidelines range. His arguments also presume that if he were resentenced today, which is the relief he is seeking, he would receive a lighter sentence with the career offender enhancement out of the picture. We are not so sure of either proposition.

Gilbert's sentencing occurred in 1997, eight years before the decision in <u>United States v. Booker</u>, 543 U.S. 220, 125 S.Ct. 738 (2005), and while the mandatory guidelines system was still in effect. At sentencing his 1994 conviction for carrying a concealed weapon was counted as a "crime of violence" as that term is used in § 4B1.1 and defined in § 4B1.2(a). The result was that Gilbert was treated as a career offender, which did result in a much higher guidelines range— 292 to 365 months instead of 151 to 188 months.

If <u>Begay</u> had begotten <u>Archer</u> before Gilbert was sentenced and his sentence was affirmed on direct appeal, his earlier weapons conviction would not have been treated as a crime of violence under § 4B1.2(a), and he would not have been classified as a career offender under § 4B1.1. As a result, Gilbert would have had a

20

lower guidelines range in that pre-Booker, mandatory guidelines era and would have received a lower sentence if we assume that the government still would have waived its statutory right to have a mandatory life sentence imposed on him. But that is a big assumption.

On the possession of crack cocaine with intent to distribute charge, Gilbert faced a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A), which requires life imprisonment for anyone who possesses crack cocaine or other drugs with intent to distribute after being convicted of two or more felony drug offenses. The government filed a 21 U.S.C. § 851 notice listing three prior felony drug offenses that Gilbert had been convicted of before he committed the crack cocaine distribution offense in this case, all of which qualified him for the mandatory life sentence. See supra at 9–11. Gilbert never denied the existence or validity of any of the three prior drug convictions listed in the § 851 notice (or any of his other convictions either). By failing to object to the part of the presentence report listing his prior convictions, Gilbert admitted them, see United States v. Bennett, 472 F.3d 825, 833–34 (11th Cir. 2006); United States v. Wade, 458 F.3d 1273, 1277 (11th Cir. 2006), and to this day he has never disputed their validity.

If the Begay decision had been on the books when Gilbert was facing these charges, the government would have known that the guidelines range he faced was

21

151 to 188 months instead of 292 to 365 months. Given a minimum sentence that was 141 months lower, the government might well have decided not to waive the § 851 notice and the mandatory life sentence it had an absolute right to insist on under § 841(b)(1)(A). It is one thing not to insist on a life sentence when the defendant is facing at least 292 months without the enhancement, and quite another to forgo it if he might be sentenced to less than half that much time.

While the government did waive its right to insist on a mandatory life sentence as part of a plea bargain, the record does not establish that it would have done so if it could not have counted on the career offender enhancement to double the sentence that Gilbert would receive. It is not as though the government needed a guilty plea because there was a risk of acquittal or the trial would have taken a long time. The evidence against Gilbert was overwhelming and the trial would have been short and simple. Two police officers saw Gilbert as he sold crack cocaine out of his car. Soon thereafter, when another officer approached him, Gilbert attempted to flee on foot. The charges against Gilbert were based on crack cocaine that was found in the glove compartment of his car, and marijuana that was bagged for sale and found under the seat. Even if Gilbert had wanted to take the stand and deny it all, there is little or no chance a jury would have believed him given all of the evidence against him and all of his prior convictions. And the fact

22

that Gilbert had brought his little daughter along with him while dealing drugs would have squelched any stray feelings of sympathy that the jury might otherwise have felt for him.

The point is that we cannot say with certainty that if Begay and Archer had been the law when Gilbert committed these crimes, he would have received a lesser sentence. Ironically, for the reasons we have just discussed, he might have received an even harsher one. Rather than speculate, however, we will assume for present purposes that if those two decisions had been on the books more than a decade earlier, Gilbert would have received a substantially lighter sentence then than he did—a sentence in the range of 151 to 188 months instead of 292 months.[10] That is, however, only an assumption.

Gilbert also presumes that if he could just get a new sentence hearing, he will receive a shorter sentence than the one he now has. We have our doubts about

_____

[10]Actually, the assumption might extend to an even lower guidelines range. If Gilbert had not been classified as a career offender under § 4B1.1, he would have been eligible for resentencing consideration under Amendment 706. The district court held in Gilbert's 18 U.S.C. § 3582(c) proceeding that he was ineligible for resentencing under that amendment because it does not apply to career offenders. See United States v. Moore, 541 F.3d 1323, 1330 (11th Cir. 2008). If it were not for Gilbert's career offender status, under Amendment 706 the district court would have recalculated his guidelines range to 130 to 162 months and then had discretion under § 3582(c)(2) to impose a new sentence after considering the factors set out in 18 U.S.C. § 3553(a). See United States v. Bravo, 203 F.3d 778, 780–81 (11th Cir. 2000). However, the court also would have had discretion under § 3582(c) to let Gilbert's original guidelines range and sentence stand. See id. And there are many reasons it might have decided to do so after consulting § 3553(a). See infra at 25–26.

23

that.  It is true that if Gilbert is resentenced the calculation of his guidelines range will be free of any Begay/Archer error and he will not be treated as a career offender.  His guidelines range will be lower.  There is, however, no guarantee that his new sentence under the post-Booker advisory guidelines system will be shorter than 292 months.  It could be the same or even longer.

There are a number of 18 U.S.C. § 3553(a) factors in Gilbert's case that a sentencing judge could use to vary upward substantially from the advisory guidelines range.  After all, in a six-year period when he was between the ages of 19 and 25, Gilbert committed and was convicted of five drug felonies and three weapons felonies.  See supra at 6–9.  He is an eight-time drug and weapons felon.  And his record includes a number of occasions on which he was shown leniency in the form of dropped charges, probationary sentences, or early release.  Every time Gilbert received probation, he violated it.  Every time charges against him were dropped or he was released early, he immediately went back to his life of crime.  And, most disturbing of all, when Gilbert committed the serious drug crimes in this case he took his five-year-old daughter along with him to watch it all.  He endangered his little girl by having her in the back seat of the small car in a high crime area as crack addicts climbed into the front seat and bought drugs from him.

A sentencing judge could easily decide to vary significantly upwards from

24

the advisory guidelines range in view of: "the nature and circumstances of the offense and the history and characteristics of the defendant," § 3553(a)(1); "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," § 3553(a)(2)(A); and the need for the sentence "to afford adequate deterrence to criminal conduct," § 3553(a)(2)(B). A sentence of 292 months, or even a life sentence, would not be unreasonable or disproportionate to the crime. See Harmelin v. Michigan, 501 U.S. 957, 1002–03, 111 S.Ct. 2680, 2705–06 (1991) (plurality opinion of Kennedy, J., joined by O'Connor & Souter, JJ.)[11] (discussing the great harm that the crime of possessing cocaine with intent to distribute does to society and holding that a life without parole sentence is not disproportionate even for a first time offender); United States v. Villareal, 613 F.3d 1344, 1359–60 (11th Cir. 2010) (upholding as substantively reasonable a 328-month sentence for a defendant convicted of conspiracy to distribute marijuana); United States v. Chavez, 584 F.3d 1354, 1366 (11th Cir. 2009) (upholding as substantively reasonable a sentence of life imprisonment for a defendant convicted of conspiracy to possess with intent to distribute five kilograms or more of cocaine and 500 grams or more of methamphetamine, and aiding and abetting the possession of a

---

[11]Justice Kennedy's plurality opinion in Harmelin is the opinion of the Court on the proportionality issue. United States v. Farley, 607 F.3d 1294, 1339–40 & n.30 (11th Cir. 2010).

25

firearm by an illegal alien).[12]

Nonetheless, because it does not affect our reasoning or the result we reach, we will assume that Gilbert would receive a substantially lower sentence if he were resentenced today, just as we are assuming that his sentence would have been lower when he was sentenced in 1997 if the Begay and Archer decisions had been out at that time.

Begay and Archer were not, however, issued before Gilbert was sentenced. They were issued eleven years after Gilbert was sentenced, ten years after we affirmed his sentence on direct appeal, nine years after the Supreme Court denied certiorari review, and five years after his § 2255 motion was denied. Gilbert's sentence had long since become final before those two decisions were issued. The question we face is whether there is a finality-shattering procedure that allows Gilbert to have his sentence vacated and entitles him to be resentenced all these years later.

## B. The Savings Clause Issue

Having already unsuccessfully filed a § 2255 motion raising other issues,

---

[12]We realize, of course, that the judge who sentenced Gilbert in 1997 wanted to give him a shorter sentence. That judge, however, would not be handling any resentencing of Gilbert, because he was a visiting judge from New York who has not been back to the Middle District of Florida in at least a decade.

Gilbert concedes, and we agree, that he may not raise his Begay/Archer claim about the misapplication of the career offender guidelines in another § 2255 motion. Section 2255(h) bars second and successive motions except in two narrow circumstances, neither of which applies here. See 28 U.S.C. § 2255(h)(1) & (2).

Gilbert's primary contention is that his claim is cognizable in a 28 U.S.C. § 2241 petition for a writ of habeas corpus. Section 2255(e), however, provides that a § 2241 petition "shall not be entertained" if the prisoner has failed to seek or has already been denied relief by § 2255 motion, as Gilbert has, "unless it also appears that the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of his detention." See 28 U.S.C. § 2255(e). The quoted exception to the § 2255(e) bar on § 2241 petitions, commonly referred to as the "savings clause," is the focus of our issue: Does the savings clause of § 2255(e) apply to claims that the sentencing guidelines were misapplied in the pre-Booker mandatory guidelines era in a way that resulted in a substantially longer sentence that does not exceed the statutory maximum?

### 1. Some Issues We Need Not Decide

The government asserts, as its first line of defense, that a guidelines misapplication claim may not be brought in any collateral attack, not even an initial one. We have no reason to decide that issue because this is not Gilbert's first

27

collateral attack on his sentence. He filed a § 2255 motion that was denied in 2003.[13]

The government concedes that a claim that a sentencing error resulted in a sentence longer than the statutory maximum may be brought in an initial § 2255 motion or, if that remedy is foreclosed by § 2255(h), in a § 2241 habeas petition by virtue of the savings clause in § 2255(e). We have no reason to decide whether to write that concession into the law of this circuit because Gilbert was not sentenced in excess of the statutory maximum for his crimes.[14] We have written into our phrasing of the issue that is before us the qualification that Gilbert's sentence did not exceed the statutory maximum. We did that in order to make it clear we are not deciding that issue, and we do not imply any view about how that issue should be decided when and if it is presented in some other case.

---

[13]Our decision not to decide whether Gilbert's Begay/Archer claim could be brought in a first § 2255 motion renders irrelevant some of the decisions that Gilbert relies on. See, e.g., Davis v. United States, 417 U.S. 333, 346–47, 94 S.Ct. 2298, 2305 (1974) (claim that the prisoner was convicted of an act that the law did not make criminal is cognizable in a first § 2255 motion); Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468, 471 (1962) (claim that the prisoner had been denied his right under a rule of criminal procedure to make a statement before being sentenced is not cognizable in a first § 2255 motion). Neither Davis nor Hill had to do with the savings clause or the type of claims that could be brought through that or any other procedure after an earlier § 2255 motion had been denied.

[14]If that issue were before us, we would not be bound to accept the government's concession. See Roberts v. Galen of Va., Inc., 525 U.S. 249, 253, 119 S.Ct. 685, 687 (1999) ("[T]he concession of a point on appeal by respondent is by no means dispositive of a legal issue."); United States v. Lee, 586 F.3d 859, 866 (11th Cir. 2009) (noting that a court is not required to accept the concession of the government as a party).

We do need to explain here what we mean by "statutory maximum sentence." For each crime, Congress prescribes a punishment ceiling beyond which no defendant convicted for committing that particular crime may be sentenced regardless of the circumstances of the crime, regardless of the defendant's history, and regardless of the sentencing guidelines. In Gilbert's case § 841(b)(1)(A) specified a punishment range of ten years to life for the crime of possession of 50 or more grams of cocaine base with intent to distribute.[15] See 21 U.S.C. § 841(b)(1)(A) & (b)(1)(A)(iii) (1996). Life imprisonment is the statutory maximum sentence for Gilbert's crime. See id.

That seems obvious, but attempting to bring himself within the scope of the government's concession, Gilbert insists that the maximum sentence specified in the statute providing a punishment range for the crime of conviction is not really the statutory maximum sentence. Instead, he argues that with a pre-Booker mandatory guidelines sentence, the top of the guidelines range, as correctly calculated or recalculated to take into account any changes in case law, is the maximum statutory sentence. His reasoning is that because Congress authorized the Sentencing Commission to prescribe the sentencing guidelines and made the guidelines mandatory, they trump the statutory punishment range or at least

---

[15]An amendment to § 841 effective August 3, 2010 changed "50 grams or more" to "280 grams or more." See 21 U.S.C. § 841(b)(1)(A)(iii) (2010).

29

supersede what would otherwise be the statutory maximum. We disagree. To the extent of any inconsistency, the guidelines would have to bend to statutorily prescribed limits, not the other way around. See U.S.S.G. § 5G1.1 (a)–(b) (stating that when the statutory maximum is less than the minimum of the applicable guidelines range, or when the statutory minimum is greater than the maximum of the applicable guidelines range, the statutory maximum and minimum prevail); see generally United States v. Shimoda, 334 F.3d 846, 849–50 (9th Cir. 2003) (rejecting defendant's argument that sentencing guidelines were "statutes of conviction" as that term was used in his plea agreement); United States v. Dawn, 129 F.3d 878, 883 n.8 (7th Cir. 1997) ("[T]he Sentencing Guidelines are not laws in the sense that penal statutes are."); Mungiovi v. Chicago Hous. Auth., 98 F.3d 982, 984 (7th Cir. 1996) ("[A]lthough the [Sentencing] Guidelines have the 'force of law,' they are not statutes."); Scott v. United States, 997 F.2d 340, 341 (7th Cir. 1993) (concluding that sentencing guidelines are not "laws" within the meaning of § 2255).

In any event, Gilbert's point is beside the point. The government can shape its concession as it pleases. The government concedes only that a sentence beyond the maximum punishment statutorily specified for anyone who commits the crime may be remedied in a § 2255 motion or through the savings clause in a § 2241

petition. And that is, once again, an issue we are not deciding.

## 2. The Text and History of the Clause

We turn now to the issue we are deciding. The text of the savings clause itself does not indicate that it authorizes the filing of a § 2241 petition to remedy a miscalculation of the sentencing guidelines that already has been, or may no longer be, raised in a § 2255 motion. The language of the savings clause provides that it applies, and a § 2241 petition may be filed, only when "the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of [the petitioner's] detention." 28 U.S.C. § 2255(e). The history behind the savings clause does not provide much help with its meaning. See Wofford, 177 F.3d at 1238–41; id. at 1241 ("Unfortunately, we have found nothing in the legislative history explaining why the relevant language was changed or what the new language means."); In re Davenport, 147 F.3d 605, 609 (7th Cir. 1998) ("[T]he legislative history is uninformative . . . . Again, there is no helpful legislative history."); see generally United States v. Hayman, 342 U.S. 205, 72 S.Ct. 263 (1952); but see Prost v. Anderson, 636 F.3d 578, 588 (10th Cir. 2011) ("[T]he history of the clause illustrates that Congress's purpose in enacting it surely wasn't to ensure that a prisoner will win relief on a meritorious successive motion, or receive multiple bites at the apple."). What does the provision mean? This is one of those times

31

when it is easier to determine something that a provision does not mean, and that determination is enough to dispose of this case.

### 3. The Relationship of § 2255(e) and 2255(h)

Assuming that a sentencing guidelines error that resulted in a longer sentence may be remedied in a collateral proceeding, the reason Gilbert cannot obtain relief through a § 2255 motion now is that he unsuccessfully filed one earlier (six years before he filed this motion), and § 2255(h) expressly bars him from filing another one. See 28 U.S.C. § 2255(h). The existence of the statutory bar on second and successive motions cannot mean that § 2255 is "inadequate or ineffective" to test the legality of Gilbert's detention within the meaning of the savings clause. If it did, the savings clause would eviscerate the second or successive motions bar, and prisoners could file an endless stream of § 2255 motions, none of which could be dismissed without a determination of the merits of the claims they raise.

That simply cannot be, as every circuit to address the matter has pointed out. See e.g., Prost v. Anderson, 636 F.3d 578, 586 (10th Cir. 2011) ("If the rule were otherwise—if the § 2255 remedial mechanism could be deemed 'inadequate or ineffective' any time a petitioner is barred from raising a meritorious second or successive challenge to his conviction—subsection (h) would become a nullity, 'a

meaningless gesture.'"); United States v. Peterman, 249 F.3d 458, 461 (6th Cir. 2001) ("The circumstances in which § 2255 is inadequate and ineffective are narrow, for to construe § 2241 relief much more liberally than § 2255 relief would defeat the purpose of the restrictions Congress placed on the filing of successive petitions for collateral relief."); United States v. Barrett, 178 F.3d 34, 50 (1st Cir. 1999) ("A petition under § 2255 cannot become 'inadequate or ineffective,' thus permitting the use of § 2241, merely because a petitioner cannot meet the AEDPA 'second or successive' requirements. Such a result would make Congress's AEDPA amendment of § 2255 a meaningless gesture."); In re Davenport, 147 F.3d 605, 608 (7th Cir. 1998) (rejecting the argument that "when the new limitations [on second or successive motions] prevent the prisoner from obtaining relief under 2255, his remedy under that section is inadequate and he may turn to 2241," with this explanation: "That can't be right; it would nullify the limitations."); Triestman v. United States, 124 F.3d 361, 376 (2d Cir. 1997) ("If it were the case that any prisoner who is prevented from bringing a § 2255 petition could, without more, establish that § 2255 is 'inadequate or ineffective' . . . then Congress would have accomplished nothing at all in its attempts—through statutes like the AEDPA—to place limits on federal collateral review."). We join all of those other circuits in refusing to interpret the savings clause in a way that would drop the § 2255(h) bar

33

on second and successive motions, defeat its purpose, and render it pointless.

Fundamental canons of statutory construction support the conclusion that the generally worded and ambiguous savings clause, which was first enacted in 1947, cannot override the specifically worded and clear statutory bar on second or successive motions that was enacted as part of AEDPA in 1996. An ambiguous or general statutory provision enacted at an earlier time must yield to a specific and clear provision enacted at a later time. See Morton v. Mancari, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2483 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."); Nguyen v. United States, 556 F.3d 1244, 1253 (11th Cir. 2009) ("The canon is that a specific statutory provision trumps a general one."); ConArt, Inc. v. Hellmuth, Obata + Kassabaum, Inc., 504 F.3d 1208, 1210 (11th Cir. 2007) ("We don't have the authority to excise specific statutory provisions in favor of more general ones."); id. ("[W]here two statutory provisions would otherwise conflict, the earlier enacted one yields to the later one to the extent necessary to prevent the conflict."); I.C.C. v. S. Ry. Co., 543 F.2d 534, 539 (5th Cir. 1976) ("Under the usual rules of statutory construction, where there is a conflict between an earlier statute and a subsequent enactment, the subsequent enactment governs.").

### 4. Finality Interests

The critically important nature of the finality interests safeguarded by § 2255(h) also weighs heavily against an interpretation of the savings clause that would lower the second or successive motions bar and permit guidelines-based attacks years after the denial of an initial § 2255 motion. Sentencing guidelines provisions are many and complex, the English language and those who use it are imperfect, and the case law about what various and sundry guidelines mean and whether they apply in different factual situations is in a constant state of flux. See, e.g., United States v. Williams, 529 F.3d 1, 2 (1st Cir. 2008) (describing the case law surrounding the federal sentencing guidelines as a "precedential labyrinth"); United States v. Mills, 485 F.3d 219, 223 (4th Cir. 2007) ("Guideline drafters have, in fact, transformed the technique [of cross-referencing] into something of an art: The Sentencing Guidelines are a veritable maze of interlocking sections and statutory cross-references."); United States v. Williams, 431 F.3d 767, 773 (11th Cir. 2005) (Carnes, J., concurring) (referring to "the Sentencing Guidelines, some provisions of which are mind-numbingly complex").

The single guidelines term that gave rise to this litigation illustrates the phenomenon. Many are the decisional oars that have churned the law about the meaning of "crime of violence," as it appears in § 4B1.1. See, e.g., Johnson v.

35

United States, ___ U.S. ___, 130 S. Ct. 1265, 1271–72 (2010); Chambers v. United States, 555 U.S. 122, ___, 129 S.Ct. 687, 691–93 (2009);  Begay v. United States, 553 U.S. 137, 144–148, 128 S.Ct. 1581, 1586–88 (2008);  United States v. McGill, 618 F.3d 1273, 1274–79 (11th Cir. 2010); United States v. Rainer, 616 F.3d 1212, 1215–16 (11th Cir. 2010); United States v. Williams, 609 F.3d 1168, 1169–70 (11th Cir. 2010); United States  v. Harris, 608 F.3d 1222, 1225–26, 1233 (11th Cir. 2010); United States v. Whitson, 597 F.3d 1218, 1221–23 (11th Cir. 2010); United States v. Harrison, 558 F.3d 1280, 1293–96 (11th Cir. 2009); United States v. Lee, 586 F.3d 859, 873–74 (11th Cir. 2009); United States v. Archer, 531 F.3d 1347, 1352 (11th Cir. 2008).[16]  And there will undoubtedly be more churning to come as additional decisions are issued  refining the term "crime of violence" as it applies to hundreds of crimes variously defined in the codes of the fifty states and in the federal criminal code that might be classified as violent.  From 1991 to 2004 the § 4B1.1 career offender guideline was applied in 2,906 cases in this circuit alone.  See United States Petition for Rehearing, App. B.  It was applied in 16,049 cases nationwide during that same period.  Id.

Of course, the finality-busting effects of permitting prisoners to use the

---

[16]Some of the listed decisions concern the definition of "violent felony" in the ACCA, but we have held that term is "virtually identical" to "crime of violence" in  § 4B1.1, so that decisions about one apply to the other.  See United States v. Harris, 586 F.3d 1283, 1285 (11th Cir. 2009); Oliver, 20 F.3d at 417–18.

36

savings clause as a means of evading the second or successive motions bar would not be confined to cases in which later case law development showed errors were made in applying the § 4B1.1 career offender enhancement. The rule Gilbert asks us to create for his benefit would apply to every type and kind of enhancement, of which there are scores in the sentencing guidelines. Many of those enhancements turn on terms whose precise meaning is not manifestly clear even where the terms are defined in the guidelines. Definitions employ their own terms, the meaning of which can also be debatable, as the whole saga with the § 4B1.1 term "crime of violence" and its § 4B1.2(a) definition of that term proves. Consider just a few examples of enhancement terms which lend themselves to litigation about their extent and scope, and thereby open up the possibility of clarifying case law years after sentences are imposed: "physical contact," "bodily injury," "substantial bodily injury," "permanent or life-threatening bodily injury," "reckless conduct," "custody, care or supervisory control of the defendant," "uncontrollable circumstances," "substantial disruption of public, governmental, or business functions or services," "a pattern of activity," "a substantial part of a fraudulent scheme," "personal information," and "abuse of a position of trust."[17] Those terms,

---

[17]Those terms, in the order listed, appear in at least the following provisions of the sentencing guidelines: §§ 2A2.4(b)(1)(A); 2A2.2(b)(3); 2A2.3(b)(1)(B); 2A2.1(b)(1)(A); 2A1.4(a)(2)(A); 2A3.1(b)(3)(A); 2A3.5(b)(2)(B); 2A6.1(b)(4)(A); 2A6.2(b)(1)(D); 2B1.1(b)(9)(B); 2B1.1(b)(15)(B); 3B1.3 (2010).

and many others like them, form a seed bed from which decisions can sprout, undermining sentencing calculations that were made years before.

And the rule Gilbert is seeking could not be confined to sentence miscalculations based on enhancement errors. If the savings clause operates to allow attacks on old sentences that were lengthened by enhancements that later decisions have called into doubt, there is no reason it would not also operate to do the same with any other guidelines calculation error. As a result, no federal judgment imposing a sentence would be truly final until the sentence was completely served or the prisoner had gone on to face a different kind of final judgment. The exception that Gilbert would have us write into § 2255(h) using the savings clause as our pen would wreak havoc on the finality interests that Congress worked so hard to protect with the AEDPA provisions.[18]

As we have pointed out more than once, "one of the principal functions of AEDPA was to ensure a greater degree of finality for convictions." Johnson v. United States, 340 F.3d 1219, 1224 (11th Cir. 2003); see also Jones v. United States, 304 F.3d 1035, 1039 (11th Cir. 2002) ("A fundamental purpose for the

_____

[18]Gilbert's contentions have a little more allure because he is the one who first litigated what would become known as the Archer issue and the first one to have the issue decided against him in this circuit. There is, however, no trailblazer exception to the § 2255(h) bar against second or successive motions or to the inapplicability of the savings clause to guidelines misapplication claims. There could be no principled basis for a special exception that would grant relief to the first petitioner to raise an issue but deny it to all who came after him. The rule that is announced must apply to all.

38

AEDPA was to establish finality in post-conviction proceedings."). The Supreme Court has reached the same conclusion we have about what Congress did and why, observing that "AEDPA's purpose [is] to further the principles of comity, finality, and federalism." Williams v. Taylor, 529 U.S. 420, 436, 120 S.Ct. 1479, 1490 (2000). More particularly, the Supreme Court has explained that "AEDPA's central concern [is] that the merits of concluded criminal proceedings not be revisited in the absence of a strong showing of actual innocence." Calderon v. Thompson, 523 U.S. 538, 558, 118 S.Ct. 1489, 1502 (1998). To put it in the vernacular, the provisions of AEDPA, like § 2255(h), are a big deal for finality of judgment. Or to put it in topographical terms, as the Supreme Court has, "The enactment of AEDPA in 1996 dramatically altered the landscape for federal habeas corpus petitions." Rhines v. Weber, 544 U.S. 269, 274, 125 S.Ct. 1528, 1533 (2005).

The statutory bar against second or successive motions is one of the most important AEDPA safeguards for finality of judgment. As we explained in our en banc decision in the Gonzalez case, "The central purpose behind the AEDPA was to ensure greater finality of state and federal court judgments in criminal cases, and to that end its provisions greatly restrict the filing of second or successive petitions." Gonzalez v. Sec'y for Dep't of Corr., 366 F.3d 1253, 1269 (11th Cir.

39

2004) (en banc) aff'd on other grounds sub nom. Gonzalez v. Crosby, 545 U.S. 524, 125 S.Ct. 2641 (2005); see also Tyler v. Cain, 533 U.S. 656, 661, 121 S.Ct. 2478, 2481–82 (2001) ("AEDPA greatly restricts the power of federal courts to award relief to state prisoners who file second or successive habeas corpus applications."). If second and successive motions are not "greatly restrict[ed]," there will be no end to collateral attacks on convictions and sentences, and there will be no finality of judgment.

That would be a bad thing because "[o]ne of the law's very objects is the finality of its judgments." McCleskey v. Zant, 499 U.S. 467, 491, 111 S.Ct. 1454, 1468 (1991). "Neither innocence nor just punishment can be vindicated until the final judgment is known." Id., 111 S.Ct. at 1468. The principle of finality of judgment "is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect." Teague v. Lane, 489 U.S. 288, 309, 109 S.Ct. 1060, 1074 (1989). The lack of finality also frustrates rehabilitation. See Engle v. Isaac, 456 U.S. 107, 127 n.32, 102 S.Ct. 1558, 1571 n.32 (1982). "Both the individual criminal defendant and society have an interest in insuring that there will at some point be the certainty that comes with an end to litigation . . . ." Id. at 127, 102 S.Ct. at 1571 (quotation marks and alteration omitted). Justice Powell, in a passage that the Supreme Court would

later quote with approval, pointed out why we must have finality of judgment:

> No effective judicial system can afford to concede the continuing theoretical possibility that there is error in every trial and that every incarceration is unfounded. At some point the law must convey to those in custody that a wrong has been committed, that consequent punishment has been imposed, that one should no longer look back with the view to resurrecting every imaginable basis for further litigation . . . .

Schneckloth v. Bustamonte, 412 U.S. 218, 262, 93 S.Ct. 2041, 2065 (1973) (Powell, J., concurring) (quoted with approval in Engle, 456 U.S. at 122 n.31, 102 S.Ct. at 1571 n.31). And on another occasion the Court explained that "[a] procedural system which permits an endless repetition of inquiry into facts and law in a vain search for ultimate certitude implies a lack of confidence about the possibilities of justice that cannot but war with the effectiveness of underlying substantive commands." McCleskey v. Zant, 499 U.S. 467, 492, 111 S.Ct. 1454, 1469 (1991) (quotation marks omitted). The Court warned that "[t]here comes a point where a procedural system which leaves matters perpetually open no longer reflects humane concern but merely anxiety and a desire for immobility." Id., 111 S.Ct. at 1469 (quotation marks omitted); see also Custis v. United States, 511 U.S. 485, 497, 114 S.Ct. 1732, 1739 (1994) ("As we have explained, inroads on the concept of finality tend to undermine confidence in the integrity of our procedures and inevitably delay and impair the orderly administration of justice." (alteration

and quotation marks omitted)).  We believe that for claims of sentence error, at least where the statutory maximum was not exceeded, the point where finality holds its own against error correction is reached not later than the end of the first round of collateral review.

We decline Gilbert's invitation to undermine finality of judgment principles by using § 2255(e) to knock down the second or successive motions bar that Congress constructed in § 2255(h).

### 5.  Decisions of Other Circuits on This Issue

Every circuit to decide this issue has reached the same conclusion we do: the savings clause of § 2255(e) does not permit a prisoner to bring in a § 2241 petition a guidelines miscalculation claim that is barred from being presented in a § 2255 motion by the second or successive motions bar of § 2255(h).  Not one circuit has held to the contrary.

The Fifth Circuit addressed the issue in Kinder v. Purdy, 222 F.3d 209 (5th Cir. 2000), a case in which the petitioner had been sentenced, when the guidelines were mandatory, to a sentence enhanced by the § 4B1.1 career offender provision. A later decision unmistakably showed that the career offender provision should never have been applied to the petitioner and that his mandatory guidelines sentence should have been shorter.  Id. at 211–12.  Because Kinder had already

unsuccessfully filed a § 2255 motion, he brought his claim under § 2241, contending that he was entitled to do so by virtue of the savings clause in § 2255(e). Id. He argued that he was "actually innocent of being a § 4B1.1 career offender," and that the savings clause route was the only one he could use to get a remedy for his erroneous sentence. Id. at 212–13. Although it recognized that as a practical matter the petitioner could not have raised the claim before, see id. at 213, the Fifth Circuit rejected his attempt to use the savings clause to remedy the misapplication of the § 4B1.1 career offender guidelines provision to him, see id. at 213–14.

The Fifth Circuit explained in Kinder that the savings clause had not been— and it should not be—applied to sentencing claims, such as a claim that the § 4B1.1 career offender provision had been erroneously applied. Id. The Court acknowledged that some courts had held that the savings clause applies where the petitioner can show actual innocence of the crime of conviction itself. Id. at 213–14 ("Where the petitioner's case has been viewed as falling within the savings clause, it was in part because the petitioner arguably was convicted for a nonexistent offense. Thus, in each case, the petitioner could claim he was actually innocent of the crime of which he was convicted.") (footnote and citations omitted)). But it correctly distinguished actual innocence of the crime of

43

conviction from a claim that the petitioner was "innocent" of some guidelines enhancement, such as the one for career offenders. See id. at 213 ("Kinder's argument that he is actually innocent of being a career offender in light of [a later decision], however, is not the type of argument that courts have recognized may warrant review under § 2241."); accord Padilla v. United States, 416 F.3d 424, 427 (5th Cir. 2005) ("Thus, because Padilla does not attack his conviction and his claims challenge only the validity of his sentence, Padilla's § 2241 petition does not fall within the savings clause of § 2255."); see also Jeffers v. Chandler, 253 F.3d 827, 831 (5th Cir. 2001) (holding that "'[a]ctual innocence' for the purposes of our savings clause test could only be shown if Jeffers could prove that based on a retroactively applicable Supreme Court decision, he was convicted for conduct that did not constitute a crime.").

The Sixth Circuit agrees. In United States v. Peterman, 249 F.3d 458 (6th Cir. 2001), after the three appellants' pre-Booker sentences had been affirmed, an intervening decision in a co-conspirator's case established that the three appellants had received longer sentences than they should have under the law. Id. at 459–60. Because they were barred from filing a second or successive motion by § 2255(h) and by the statute of limitations contained in § 2255(f), the three appellants filed § 2241 motions, seeking relief under the savings clause. Id. at 460. Finding that

there had been a change in the law that was applicable to their case, and that it would be a miscarriage of justice not to give the three the benefit of a correct sentence, the district court granted their § 2241 petitions and resentenced them to lesser terms. Id.

The Sixth Circuit reversed that application of the savings clause to sentencing claims, holding that while the savings clause applies to claims of actual innocence of the crime of conviction, it does not apply to sentencing claims, at least not where the sentence being attacked does not exceed the statutory maximum. Id. at 461–62. In reaching its decision, the Court warned that: "The circumstances in which § 2255 is inadequate and ineffective are narrow, for to construe § 2241 relief much more liberally than § 2255 relief would defeat the purpose of the restrictions Congress placed on the filing of successive petitions for collateral relief" in the AEDPA. Id. at 461. The Sixth Circuit acknowledged that some courts had held the savings clause applies to claims based on intervening changes in the law establishing a petitioner's actual innocence of the crime of conviction, but the Court was firm in its conclusion that the clause was not available to the three petitioners in that case who were challenging only their sentences. Id. at 462.

The Third Circuit has reached the same conclusion. See Okereke v.United

45

States, 307 F.3d 117, 120–21 (3d Cir. 2002) (pre-Booker sentence) ("Unlike the intervening change in law in In re Dorsainvil [119 F.3d 245, 251 (3d Cir. 1997)] that potentially made the crime for which that petitioner was convicted non-criminal, Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000)] dealt with sentencing and did not render conspiracy to import heroin, the crime for which Okereke was convicted, not criminal."); see also United States v. Kenney, No. 01-4318, 391 Fed. App'x 169, 172 (3d Cir. Aug. 20, 2010) (unpublished) (explaining that under the Okereke decision the savings clause and § 2241 "relief is available only in 'rare situations' where the crime of conviction was later deemed non-criminal" and "is not available for intervening changes in the sentencing law").

While acknowledging that no circuit has embraced her position, one of our dissenting colleagues views the Seventh Circuit's decision in In re Davenport, 147 F.3d 605 (7th Cir. 1998), as "favorable to Mr. Gilbert," and suggests that "it may well be that he would prevail in the Seventh Circuit." Dissenting Op. of Martin, J., at 100. Actually, the Davenport decision establishes just the opposite.

There were two petitioners in that case—Davenport and Nichols. Davenport, 147 F.3d at 607. Davenport, who had already filed one § 2255 motion challenging his sentence, filed what the district court construed as a second motion

46

to challenge the enhancement of his sentence under the ACCA.  Id.  He contended,

among other things, that he should be allowed to file a second or successive motion

under § 2241 challenging his sentence because he was "innocent" of being an

armed career criminal.  Id. at 609–10.  In rejecting that contention and affirming

the district court's denial of relief, Judge Posner explained for the Seventh Circuit

why claims that sentencing enhancements had been misapplied could not be

cognizable under the savings clause:

> [Davenport] complains that if he is indeed innocent of the "armed career criminal" offense, it is atrocious that he should have no remedy against languishing in prison except for an appeal, which is quite likely to be futile, to executive clemency.  But if this complaint were to be accepted, it would make an arbitrary hole in the Antiterrorism Act.  Davenport is attacking his sentence rather than his conviction, for the armed career criminal act is a sentence-enhancement statute; he is "innocent" (if his claim has merit) only in a technical sense.  For him to be able to file successive motions for postconviction relief, but not someone who had been denied all right to counsel or had a confession beaten out of him but was unable to argue that he had in fact been innocent of the crimes of which he had been convicted, would correspond to no intelligible concept of either legal or substantive justice.  And the privileged status for which Davenport contends would if accepted allow him to file not just one successive appeal; a prisoner who was claiming to be innocent could by the logic of Davenport's argument file an indefinite number of successive motions for postconviction relief—could indeed file an identical new motion every day of his incarceration.

Id. (emphasis added).  That explanation, and the decision it accompanied, strongly

supports the conclusion we reach and is at war with the dissenting position.

47

At the same time it rejected Davenport's claim, the Seventh Circuit ordered relief granted to Nichols, the petitioner whose case had been consolidated with Davenport's. See id. at 607, 610–12. But that part of the Davenport decision is fully consistent with the denial of relief to Gilbert in the present case. Nichols, unlike Gilbert and unlike Davenport, "ha[d] a claim that he [was] indeed being held in prison for a nonexistent crime." Id. at 610. Nichols had been convicted for violating 18 U.S.C. § 924(c) by possessing a firearm in the commission of a drug offense. Davenport, 147 F.3d at 607, 610–11. After his conviction became final and his § 2255 motion had been denied, the Supreme Court held in Bailey v. United States, 516 U.S. 137, 116 S.Ct. 501 (1995), that it was not a crime under § 924(c) to merely possess a firearm during a drug crime, as Nichols had. See Davenport, 147 F.3d at 607. The Bailey decision, which the Supreme Court made retroactively applicable, meant that Nichols had been convicted of a non-existent offense and was actually innocent of the § 924(c) crime.

The Seventh Circuit reasoned: "A procedure for postconviction relief can fairly be termed inadequate when it is so configured as to deny a convicted defendant any opportunity for judicial rectification of so fundamental a defect in his conviction as having been imprisoned for a nonexistent offense." Id. at 611 (second emphasis added). The savings clause contained in § 2255(e) saved

48

Nichols, who was convicted of a non-existent crime, but it did not save Davenport, whose sentence had been erroneously enhanced under the ACCA. See id. at 609 ("Davenport is attacking his sentence rather than his conviction, for the armed career criminal act is a sentence-enhancement statute; he is 'innocent' (if his claim has merit) only in a technical sense."). So, instead of supporting the dissenters' position in this case that the savings clause extends to sentencing claims, the Davenport decision rejects that position.

The Seventh Circuit reiterated the point in Taylor v. Gilkey, 314 F.3d 832 (7th Cir. 2002). The appellant in that case was attempting to use the savings clause to raise a sentencing claim. Refusing to allow it, the Seventh Circuit stressed that the movant who had been granted relief in Davenport (Nichols) had asserted a claim of actual innocence of the crime of conviction, unlike Taylor who was asserting a sentencing claim. Taylor, 314 F.3d at 835–36. The opinion, written by Judge Easterbrook, is devastating to Gilbert's position in this case, which our dissenting colleagues are espousing. This is how he explained the Seventh Circuit's position:

> What Davenport strongly implied—what we now make explicit—is that a claim of error in addressing the sort of constitutional theory that has long been appropriate for collateral review does not render § 2255 "inadequate or ineffective." [Section 2255(e)] poses the question whether the remedy is adequate "to test the legality" of the detention. This implies a focus on procedures rather than outcomes. Judges

49

sometimes err, but this does not show that the procedures are inadequate; it shows only that people are fallible. How often to rerun a search for error is a question to which § 2255[(h)] speaks directly, and the statutory limitation to a single collateral attack, unless the conditions of § 2255[(h)] (elaborated in 28 U.S.C. § 2244) have been met, does not render § 2255 inadequate or ineffective. If it did, then the statute would be internally contradictory. It would not be sensible to read § 2255[(h)] as making § 2255 "inadequate or ineffective" and thus nullifying itself. This is a subject on which the courts of appeals are in agreement. Every court that has addressed the matter has held that § 2255 is "inadequate or ineffective" only when a structural problem in § 2255 forecloses even one round of effective collateral review—and then only when as in Davenport the claim being foreclosed is one of actual innocence. See, e.g., Cradle v. United States ex rel. Miner, 290 F.3d 536, 538–39 (3d Cir. 2002); In re Jones, 226 F.3d 328, 333–34 (4th Cir. 2000); Reyes-Requena v. United States, 243 F.3d 893, 902–03 (5th Cir. 2001); United States v. Peterman, 249 F.3d 458, 462 (6th Cir. 2001); Wofford v. Scott, 177 F.3d 1236, 1244 (11th Cir. 1999).

Id. at 835–36 (emphasis added). The Seventh Circuit's position on the issue before us could not be clearer: Section 2255(e)'s savings clause does not apply to sentencing claims.

Contrary to Judge Martin's characterization of our position, we do not categorically state that every other circuit has interpreted the savings clause of § 2255(e) to rule out sentencing claims. See Dissenting Op. of Martin, J., at 99. We do categorically state, however, as Judge Easterbrook did in Taylor, that every circuit called upon to actually decide this issue has concluded, as we do, that the savings clause does not apply to sentencing claims, at least not to those where the

50

sentence imposed was within the statutory maximum.  Not one has held to the

contrary.[19]

The fact that the Second, Third, Fifth, and Seventh Circuits have reached the

same conclusion that we do—and without a single dissent from any of their

decisions—puts into context our own dissenters' florid phrases.  Pumping all the

pedals on the prose organ, they charge that by disagreeing with them on this legal

issue, we have not only "neglect[ed] our responsibility," "shirked our duty," and

"diminish[ed] the institution of the federal courts," Dissenting Op. of Martin, J., at

---

[19]Judge Martin seeks comfort for her position in Triestman v. United States, 124 F.3d 361 (2d Cir. 1997), but that case did not involve a sentencing claim of any type.  Instead, it involved a claim that the movant was actually innocent of the crime for which he had been convicted. Triestman, 124 F.3d at 363, 380.  Because of that, the Second Circuit could not, and did not, hold that the savings clause extended to a claim that the guidelines had been misapplied. Moreover, the Triestman opinion warned against the path the dissenters in this case would have us take, explaining that if any prisoner prevented from bringing a second or successive motion could resort to the savings clause of § 2255(e) and bring a § 2241 petition, "then Congress would have accomplished nothing at all in its attempts—through statutes like the AEDPA—to place limits on federal collateral review."  Id. at 376.

To the extent that the dissenters would have us uproot the "serious constitutional issue" standard that Triestman applied to claims of actual innocence and transplant it into cases involving misapplications of the sentencing guidelines, no court of appeals, including the Second Circuit, has ever done that.  Moreover, Triestman's squishy standard has not been favorably received by other circuits.  See Reyes-Requena v. United States, 243 F.3d 893, 903 n.28 (5th Cir. 2001) (noting that the Triestman test had been "criticized as too indefinite for practical enforcement," agreeing with that criticism, and adding that the test "creates the appearance of a standardless test with no limiting principles"); In re Davenport, 147 F.3d 605, 611 (7th Cir. 1998) (criticizing the Triestman test as "too indefinite"). We have also justifiably criticized that standard.  See Wofford, 177 F.3d at 1243 ("A 'serious constitutional question' standard is only about as definite as a 'tough issue' or 'hard set of circumstances' standard would be.  Moreover, there is no apparent logical or textual nexus between the crucial 'inadequate or ineffective' language of § 2255 and the difficulty of any constitutional issue that may arise because of that language's interpretation.").

51

94–95, but have also "adopt[ed] a posture of judicial impotency that is shocking" and that "emasculates" this Court, Dissenting Op. of Hill, J., at 102, 104, and in the process we have rendered the judicial system "morally bankrupt," id. at 104, and converted the United States into a system of "'gulags,'" id. at 105. That is not our intent.

Instead, our intent is to apply the law to the facts of the case that is before us. That is our duty. In carrying it out, we do not question our dissenting colleagues' sincerity, nor do we charge them with any offense more serious than sincerely disagreeing with our view about the meaning and effect of § 2255(e)'s savings clause in these circumstances. The circumstances are that an unquestionably guilty defendant, who was sentenced to less than the statutory maximum, claims that the sentencing guidelines were misapplied in his case based on decisions that were issued years after his sentence became final on direct appeal and years after his § 2255 motion was denied.

### 6. The Suspension Clause

None of the other circuits that have refused to apply the savings clause of § 2255(e) to sentencing claims have felt that by declining to do so they were violating the Suspension Clause of the Constitution, Art. I, § 9. Nor do we. Our dissenting colleagues disagree. In her dissenting opinion, Judge Martin relies on

United States v. Hayman, 342 U.S. 205, 72 S.Ct. 263 (1952), which involved a first time motion filed under the relatively new 28 U.S.C. § 2255 procedure. See Dissenting Op. of Martin, J., at 94. The Supreme Court in Hayman reversed the Ninth Circuit's decision that § 2255 violated the Suspension Clause. While doing that, the Court found that the district court had erred in conducting an evidentiary hearing without the movant being present. Hayman, 342 U.S. at 219–24, 72 S.Ct. at 272–75. The result was a remand for another evidentiary hearing with directions that the movant be transported to the district in which he was sentenced so that he could be present at the hearing. Id. at 223–24, 72 S.Ct. at 274–75. Having been issued 44 years before the AEDPA was even enacted, the Hayman decision did not have anything to say about any Suspension Clause issue involving § 2255(h).

The Supreme Court did have something to say in Felkner v. Turpin, 518 U.S. 651, 116 S.Ct. 2333 (1996), about the Suspension Clause as it involves the AEDPA's clamp down on second or successive petitions in 28 U.S.C. § 2254 cases. What the Court decided in Felker is that the increased restrictions that the statute placed on second or successive habeas petitions do not violate the Suspension Clause. Felker, 518 U.S. at 654, 663–64, 116 S.Ct. at 2335, 2339–40. In the course of reaching that decision, the Court explained how the "[t]he writ of habeas corpus known to the Framers was quite different from that which exists

53

today," and traced its evolution over two centuries. Id. at 663–64, 116 S.Ct. at 2340. The Court acknowledged that the AEDPA "works substantial changes" to the authority of federal courts to grant the writ, id. at 654, 116 S.Ct. at 2335, and "further restricts the availability of relief to habeas petitioners," but explained that "judgments about the proper scope of the writ are normally for Congress to make," id. at 664, 116 S.Ct. at 2340 (quotation marks omitted). Describing the law restricting second and successive filings as "a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions," the Court concluded that "[t]he added restrictions which the Act places on second or successive petitions are well within the compass of this evolutionary process, and we hold that they do not amount to a 'suspension' of the writ contrary to Article I, § 9." Id. at 664, 116 S.Ct. at 2340.

Although Felker was a § 2254 case, the Suspension Clause issue is essentially the same in § 2255 cases. The changes made by the AEDPA restrictions on second or successive filings are materially identical in both types of cases, the evolution of the remedy and restrictions on it are materially identical, and the relationship of the AEDPA changes to that evolution are materially identical. Central to the dissenters' position is the premise, which Judge Barkett articulates, that "§ 2255(e) operates to 'save' § 2255 from violating the Suspension

54

Clause of the United States Constitution." Dissenting Op. of Barkett, J., at 86.

The Felker decision demonstrates why that crucial premise cannot be right. There is no savings clause in § 2254. Yet the Supreme Court held in Felker that § 2254's restrictions on second or successive petitions, which are materially identical to those in § 2255, do not violate the Suspension Clause. Therefore, the savings clause cannot be essential to the constitutional operation of the restrictions on the second or successive filings that are contained in §§ 2254 and 2255. That clause need not, and should not, be used to punch holes in the operation of the § 2255(h) restrictions. We conclude, in keeping with the Supreme Court's decision in Felker, that the restrictions § 2255(h) places on second or successive motions do not violate the Suspension Clause.

In their dissenting opinions, Judges Barkett and Martin express their view that Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229 (2008), requires that the savings clause lift the restrictions on second or successive motions found in § 2255(h) in order to save those restrictions from running afoul of the Suspension Clause. Dissenting Op. of Barkett, J., at 86; Dissenting Op. of Martin, J., at 89. In other words, the purpose and effect of the § 2255(h) restrictions must be lost in order to save them. We disagree.

The Boumediene case did not involve prisoners who had been convicted and

55

sentenced by a federal district court, whose convictions and sentences had been reviewed by a federal appeals court, and whose previous collateral challenges to those convictions and sentences had been decided by a federal district court and court of appeals. Instead, Boumediene was an executive detention case. The Supreme Court emphasized the difference, explaining that where the petitioner is seeking relief from the judgment of a state court in federal court, "it can be assumed that, in the usual course, a court of record provides defendants with a fair, adversary proceeding," and with federal court judgments "the prisoner already has had a chance to seek review of his conviction in a federal forum through a direct appeal." 553 U.S. at 782, 128 S.Ct. at 2268. The problem with the detainee cases in Boumediene, the Court explained, is that they "fall outside these categories, however; for here the detention is by executive order." Id. at 782, 117 S.Ct. at 2268; see also id. at 797, 117 S.Ct. at 2277 ("[F]ew exercises of judicial power are as legitimate or as necessary as the responsibility to hear challenges to the authority of the Executive to imprison a person.").

The question was not whether the detainees in Boumediene were entitled to multiple rounds of habeas review of their detention but whether they were entitled to any habeas review at all. It was in that context the Court made the statement that Judges Barkett and Martin rely on, about each detainee having been denied "a

meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law." Boumediene, 553 U.S. at 779, 128 S.Ct. at 2266 (quotation marks omitted). The Suspension Clause decision about restrictions on the writ of habeas corpus in purely executive detention cases is Boumediene. The Suspension Clause decision about restrictions on second or successive petitions and motions attacking judgments of conviction and sentences is Felker. This case is governed by the Felker decision.

### 7. The Actual Innocence Exceptions

Section 2255(h) itself contains an actual innocence exception to its bar against second or successive motions, but it is a narrow one. The exception applies only when the claim is based on "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense." 28 U.S.C. § 2255(h)(1). As Gilbert concedes, this exception is of no help to him because his claim is not based on newly discovered evidence, and he does not pretend to be innocent of the offense for which he was convicted, possessing crack cocaine with intent to distribute.

A number of courts have held that the savings clause permits a claim of actual innocence of the crime of conviction to be brought in a § 2241 petition when

it cannot be brought in a second or successive motion because of § 2255(h).  This decisional law exception is broader than the statutory one contained in § 2255(h)(1), because it encompasses innocence based on changes in the law where the evidence remains the same.  The exception's primary function to date has been to permit claims based on Bailey v. United States, 516 U.S. 137, 116 S.Ct. 501 (1995), superseded by statute, Pub. L. No. 105-386, 112 Stat. 3469 (1998).  In that case the Supreme Court construed the term "use" in 18 U.S.C. § 924(c) (1995) more narrowly than many circuits had and held that passive possession of a firearm during a drug crime was not a violation of the statutory prohibition against "use" of one.  Bailey, 516 U.S. at 150, 116 S.Ct. at 509.  The Bailey decision established that many prisoners had been convicted and were serving sentences for a nonexistent crime:  passively possessing a firearm during a drug crime.  The prisoners who had already unsuccessfully pursued a § 2255 motion when the Bailey decision was released were barred by § 2255(h) from bringing their claim in a second or successive motion.  In those circumstances courts have held that the prisoners could use the savings clause to bring their Bailey actual innocence claims in a § 2241 petition.  See, e.g., Reyes-Requena v. United States, 243 F.3d 893, 904–06 (5th Cir. 2001);  In re Jones, 226 F.3d 328, 333–34 (4th Cir. 2000); In re Davenport, 147 F.3d 605, 607–11 (7th Cir. 1998); Triestman v. United States, 124

58

F.3d 361, 376–80 (2d Cir. 1997); In re Dorsainvil, 119 F.3d 245, 248 (3d Cir.

1997); see also Kinder, 222 F.3d at 213 ("Recent cases examining the scope of §

2255's savings clause have done so because of the Supreme Court's decision in

Bailey . . . .").

Bailey actual innocence claims are what the Wofford panel had in mind

when it stated that the savings clause would permit a prisoner to bring a § 2241

petition claiming that a retroactively applicable, circuit law-busting decision of the

Supreme Court established that he had been convicted of a nonexistent crime. See

Wofford, 177 F.3d at 1242–45. That statement was, however, only dicta because

all Wofford's claims were sentencing claims, "none of which rest[ed] upon a

circuit law-busting, retroactively applicable Supreme Court decision." Id. at 1245.

All of them could have been presented at trial or on appeal. Id. The actual

holding of the Wofford decision, which is undoubtedly correct, is simply that the

savings clause does not cover sentence claims that could have been raised in earlier

proceedings. See id. at 1244–45 (expressly noting that there was no need to decide

which sentencing claims, if any, the savings clause does cover).[20]

_____

[20]The Wofford opinion also contains dicta that the savings clause "may conceivably" apply to some sentencing claims in some circumstances where there was a fundamental defect in sentencing that the prisoner had no opportunity to have corrected before the end of his § 2255 proceeding. See id. at 1244–45. What the Wofford panel may have had in mind are pure Begay errors, by which we mean errors in the application of the "violent felony" enhancement, as defined in 18 U.S.C. § 924(e)(2)(B), resulting in a higher statutory minimum and maximum sentence under § 924(e). A Begay error in the classification of a prior conviction that was used

59

The Wofford dicta and the Bailey-related actual innocence decisions of other circuits are of no use to Gilbert because the crimes for which he was convicted, possessing crack cocaine with intent to distribute and possessing marijuana with intent to distribute, do exist, as thousands of federal prisoners can attest. Unable to colorably contend that he was convicted of a nonexistent crime, Gilbert asserts instead that he "is actually innocent of being a career offender, factually and legally." Put in its best light, Gilbert's argument assumes that he was convicted of the nonexistent offense of being a career offender with only one qualifying predicate offense. But he wasn't. As the indictment and the judgment in this case show, Gilbert was not charged with, nor was he convicted of, being a career

---

to impose an enhanced sentence under § 924(e) would necessarily have resulted in the defendant being sentenced to a term of imprisonment that exceeded what would have been the statutory maximum without the error. Compare 18 U.S.C. § 924(a)(2) ("Whoever knowingly violates subsection . . . (g) . . . of section 922 shall be . . . imprisoned not more than 10 years . . . ."), with 18 U.S.C. § 924(e)(1) ("In the case of a person who violates section 922(g) . . . and has three previous convictions . . . for a violent felony or a serious drug offense . . . such person shall be . . . imprisoned not less than fifteen years . . . .").

For that reason, a pure Begay error would fit within the government's concession that the savings clause applies to errors that resulted in a sentence beyond the statutory maximum that would have applied but for the error. See supra at 29–31. That is not, however, the claimed error we have in this case. Instead, Gilbert's claim is that his sentence calculation involved an Archer error in the application of § 4B1.1 of the guidelines, and that error did not result in a sentence beyond the statutory maximum. For that reason, we have no occasion to decide whether what the Wofford dicta conceived might be the law, and what the government concedes should be the law, is actually the law. What we do decide is that the savings clause does not apply to sentencing errors that do not push the term of imprisonment beyond the statutory maximum.

60

offender. A defendant who is convicted and then has the § 4B1.1 career offender enhancement, or any other guidelines enhancement, applied in the calculation of his sentence has not been convicted of being guilty of the enhancement. If guidelines enhancements were crimes, they would have to be charged in the indictment and proven to the jury beyond a reasonable doubt. See United States v. Kenney, No. 01-4318, 391 Fed. App'x 169, 172 n.2 (3d Cir. Aug. 20, 2010) (unpublished) ("The career offender enhancement is not a separate offense, however. If it were, its elements would need to be proven to a jury beyond a reasonable doubt."). Gilbert's position turns on treating sentences as convictions, and an argument that depends on calling a duck a donkey is not much of an argument.

Nor is Gilbert helped by the actual innocence of sentence exception set out in Sawyer v. Whitley, 505 U.S. 333, 112 S.Ct. 2514 (1992). That case had nothing to do with either the savings clause of § 2255(e) or with sentencing guidelines errors. Instead, it involved a second or successive motion claiming constitutional error in a jury's determination that the petitioner should be sentenced to death. In that pre-AEDPA era, the law barred raising claims in second or successive petitions unless the petitioner could show cause and prejudice or could establish a miscarriage of justice. Id. at 338–39, 112 S.Ct. at 2518–19. The miscarriage of

61

justice exception required a showing of actual (factual) innocence. Id., 112 S.Ct. at 2518–19. The question in Sawyer was when a constitutional error in capital sentencing would fit within the actual innocence exception. The answer the Supreme Court gave is that the actual innocence exception applies to constitutional errors in capital sentencing only when the constitutional error resulted in the petitioner becoming statutorily eligible for a death sentence that could not otherwise have been imposed. Id. at 348–50, 112 S.Ct. at 2523–25.

There are four reasons the Sawyer actual innocence of sentence exception does not apply in this case. First, the Supreme Court emphasized in Sawyer that its exception to the rule against second and successive petitions for actual innocence of the sentence was "a very narrow exception," id. at 341, 112 S.Ct. at 2520, and one that applied "in the setting of capital punishment," id. at 340, 112 S.Ct. at 2519; accord Cade v. Haley, 222 F.3d 1298, 1308 (11th Cir. 2000) ("[A] showing of actual innocence can only refer to those state-law requirements that must be satisfied to impose the death penalty, i.e., the elements of the capital crime and minimum required aggravating factors."). The limitation of the Sawyer holding to death sentence cases is not surprising, because the Supreme Court and this Court have long recognized that "death is different." See Monge v. California, 524 U.S. 721, 732, 118 S.Ct. 2246, 2252 (1998) (observing that "the death penalty is unique

62

'in both its severity and its finality'" (quoting Gardner v. Florida, 430 U.S. 349, 357, 97 S.Ct. 1197, 1204 (1977))); Ford v. Wainwright, 477 U.S. 399, 411, 106 S.Ct. 2595, 2602 (1986) (plurality opinion) ("[E]xecution is the most irremediable and unfathomable of penalties; . . . death is different."); Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct 2978, 2991 (1976) (plurality opinion) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long."); Peek v. Kemp, 784 F.2d 1479, 1494 (11th Cir. 1986) (en banc) (recognizing that "death is different in kind from all other criminal sanctions"); Stanley v. Zant, 697 F.2d 955, 962 (11th Cir. 1983) ("[T]he jurisprudence of this circuit has consistently recognized that 'death is different' for a variety of reasons and in a number of contexts . . . .").

Because death is different, neither the Supreme Court nor this Court has ever applied the Sawyer actual innocence of the sentence exception except in death penalty cases, and the better view is that the exception does not apply to non-capital sentencing errors. See United States v. Richards, 5 F.3d 1369, 1371 (10th Cir. 1993) ("[The defendant] does not claim to be actually innocent of the offense for which he was convicted; he claims only that he should have received a lesser sentence. A person cannot be actually innocent of a noncapital sentence, however."); see also Embrey v. Hershberger, 131 F.3d 739, 740–41 (8th Cir. 1997)

63

(en banc)[21] ("<u>Sawyer</u>, in terms, applies only to the sentencing phase of death cases."); <u>but see</u> <u>Spence v. Superintendent, Great Meadow Corr. Facility</u>, 219 F.3d 162, 170–71 (2d Cir. 2000).

The second reason that the <u>Sawyer</u> exception does not apply here is that it operates where there is constitutional error, not statutory or guidelines interpretation error. The Supreme Court expressed the holding in these terms: "We therefore hold that petitioner has failed to show by clear and convincing evidence that but for constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty under Louisiana law." <u>Sawyer</u>, 505 U.S. at 350, 112 S.Ct. at 2525; <u>see also</u> <u>id.</u> at 338, 112 S.Ct. at 2518 ("[T]he evidence he argued had been unconstitutionally kept from the jury . . . ."); <u>id.</u> at 347–48, 112 S.Ct. at 2523 (noting that Sawyer was advancing two claims, a <u>Brady</u> claim and an ineffective assistance of counsel claim).

The <u>Sawyer</u> requirement that the claim be a constitutional one is borrowed from the actual innocence exception to procedural bars for conviction claims in

---

[21] The Eighth Circuit had previously applied the actual innocence exception to a non-capital sentencing case in <u>Pilchak v. Camper</u>, 935 F.2d 145, 148 (8th Cir. 1991). That holding was impliedly overruled by <u>Embrey v. Hershberger</u>, as recognized by the Third Circuit in <u>Cristin v. Brennan</u>, 281 F.3d 404, 422 (3d Cir. 2002) ("[I]n the Eighth Circuit, an early case applying <u>Sawyer</u> to non-capital sentencings, [<u>Pilchak</u>], was effectively overruled by that Court, <u>en banc</u>, because '<u>Sawyer</u>, in terms, applies only to the sentencing phase of death cases' and the 'quarrel [in that case was] not really with his sentence, it [was] with the fact that he was convicted.'") (citation omitted).

capital and non-capital cases. See Schlup v. Delo, 513 U.S. 298, 327, 115 S.Ct. 851, 867 (1995) ("The Carrier standard [of actual innocence of a conviction] requires the habeas petitioner to show that a constitutional violation has probably resulted in the conviction of one who is actually innocent.") (quotation marks omitted); Johnson v. Fla. Dep't of Corr., 513 F.3d 1328, 1334 (11th Cir. 2008) ("To successfully plead actual innocence, a petitioner must show that his conviction resulted from 'a constitutional violation.'"). Gilbert's claim that a sentencing guidelines provision was misapplied to him is not a constitutional claim. If it were, every guidelines error would be a constitutional violation. However prescient the Founders may have been in other respects, they did not think to incorporate the sentencing guidelines into the Constitution or Bill of Rights. Nor is it plausible to suggest, as Gilbert does, that every error adversely affecting a defendant's sentence violates the Due Process Clause. Sometimes a cigar is just a cigar, and sometimes an error is just an error.

The third reason the Sawyer exception is of no help to Gilbert is that even if it were not limited to death sentences, and even if it reached non-constitutional claims, he still would fail to meet the exception's requirement that but for the claimed error he would not have been statutorily eligible for the sentence he received. See Sawyer, 505 U.S. at 348–50, 112 S.Ct. at 2523–25; Sibley v.

65

Culliver, 377 F.3d 1196, 1205 (11th Cir. 2004) (the petitioner must prove that "he is 'innocent' of the death penalty because none of the aggravating factors legally necessary for invocation of the death penalty applied"); Cade, 222 F.3d at 1308 ("Sawyer excuses procedural default . . . when a petitioner shows by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." (quotation marks omitted)). Because of the drug crimes for which he was convicted, Gilbert was statutorily eligible for a sentence of between 10 years and life. See 21 U.S.C. § 841(b)(1)(A). Even if the error in application of the § 4B1.1 career offender enhancement were undone, Gilbert would still be statutorily eligible for a sentence of 10 years to life. That is yet another reason his case does not fit within Sawyer's "very narrow exception." Sawyer, 505 U.S. at 341, 112 S.Ct. at 2520.

Finally, Gilbert is also outside the scope of the Sawyer exception for a reason explained by the Seventh Circuit in Hope v. United States, 108 F.3d 119 (7th Cir. 1997). In that case, the Seventh Circuit held that the pre-AEDPA "actual innocence" exceptions for second or successive motions did not apply to any sentencing guidelines errors after AEDPA clamped down on those motions. The petitioner in Hope had argued that AEDPA's language permitting a second § 2255

motion when "no reasonable factfinder would have found the movant guilty of the offense," see 28 U.S.C. § 2255(h)(1), should be interpreted to permit a motion raising a sentencing guidelines claim. The Hope court rejected that argument, explaining:

> The "actual innocence" exception of the prior law was judge-made, and so its contours were appropriately judge-fashioned and permissibly judge-expanded. The exception in the new law is graven in statutory language that could not be any clearer. When we consider how limited the review of sentencing traditionally was, how strongly Congress evidently disfavors successive rounds of collateral attacks on duly reviewed convictions such as that of [the defendant], how doubtful it is that any violation of the sentencing guidelines rises to the level necessary to justify collateral relief even under the standards of the old law, and the absence of any indication in the legislative history that "offense" was being used in some special sense different from its ordinary meaning, we think it highly unlikely that Congress intended the word to bear a special meaning.

Id. at 120 (citation omitted). In other words, the actual innocence of sentence exception to the bar against second or successive motions involving sentence claims, as narrow as it was, did not survive AEDPA.

For all of these reasons, we conclude that the Sawyer actual innocence of sentence exception does not apply to claims that the guidelines were misinterpreted to produce a higher guidelines range than would otherwise have applied, and that is as true with pre-Booker sentencing errors as it is with post-Booker ones.

### C. The Rule 60(b) Issue

Although he does not spend much of his argument effort on the issue, Gilbert does contend that the district court should have treated his "Motion to Reopen and Amend First 28 U.S.C. § 2255 Motion" as one under Rule 60(b)(5) & (6) and used that procedural vehicle to re-open and vacate his sentence. The district court declined to do so based on the reasoning of Gonzalez v. Crosby, 545 U.S. 524, 125 S.Ct. 2641 (2005). In that decision the Supreme Court held that state prisoners could not use Rule 60(b) to evade the second or successive petition bar contained in 28 U.S.C. § 2244(b) by either adding a new ground for relief or attacking the federal court's previous rejection of a claim on the merits. Id. at 532, 125 S.Ct. at 2648. A Rule 60(b) motion in a § 2254 case that asserts or reasserts no claim but instead attacks "some defect in the integrity of the federal habeas proceedings" is not barred. Id. at 532, 125 S.Ct. at 2648.

The petitioner in Gonzalez was a state prisoner trying to get around the § 2244(b) bar, not a federal prisoner like Gilbert trying to get around the § 2255(h) bar, and the Supreme Court did explicitly limit its consideration to state prisoner cases. See id. at 529 n.3, 125 S.Ct. at 2646 n.3. Although § 2255(h) is not identical in all respects to § 2244(b), it is close enough that the relationship between each of those two provisions and Rule 60(b) should be the same. Both of those AEDPA provisions further finality interests by severely restricting second or

68

successive collateral attacks on judgments in criminal cases. The operation and effect of both provisions would be undercut if new claims could be brought or old claims could be relitigated through the simple expedient of slapping a Rule 60(b) label on what is in all other respects a second or successive petition or motion.

We join every other circuit that has addressed the issue in concluding that the standard announced in Gonzalez applies to federal prisoner cases as well. See United States v. Buenrostro, ___ F.3d ___, 2011 WL 1023696, *1 (9th Cir. Mar. 23, 2011) ("Because § 2254 is nearly identical to § 2255 in substance . . . . [w]e agree with our sister circuits and hold that Gonzalez applies to such motions."); accord Curry v. United States, 507 F.3d 603, 604–05 (7th Cir. 2007); Nailor v. United States (In re Nailor), 487 F.3d 1018, 1021–23 (6th Cir. 2007); United States v. Nelson, 465 F.3d 1145, 1147 (10th Cir. 2006). Because Gilbert's motion sought to assert or reassert a claim for relief, instead of pointing out a defect in the integrity of the earlier § 2255 motion proceeding in his case, under Gonzalez his motion is the equivalent of a second or successive motion and is barred by § 2255(h).

## III. CONCLUSION

We do not decide whether a claim that the sentencing guidelines were misapplied may be brought in a first time § 2255 motion. Nor do we decide if the

69

savings clause in § 2255(e) would permit a prisoner to bring a § 2241 petition claiming that he was sentenced to a term of imprisonment exceeding the statutory maximum. What we do decide is that the savings clause does not authorize a federal prisoner to bring in a § 2241 petition a claim, which would otherwise be barred by § 2255(h), that the sentencing guidelines were misapplied in a way that resulted in a longer sentence not exceeding the statutory maximum. We also decide that the reasoning, standards, and tests announced by the Supreme Court in Gonzalez, which involved a state prisoner case, also apply to federal prisoner cases.

To put our reasoning and the result in the broader terms with which we began this opinion, a federal prisoner's right to have errors in the calculation of his sentence corrected is not without limits. After a case has passed the stage of a first § 2255 proceeding, the right to error correction is narrowly limited by principles of policy that reside in the finality of judgment neighborhood of the law—principles which further critically important interests. The restrictions that those finality of judgment principles place on error correction have been reinforced and strengthened by AEDPA provisions such as §§ 2255(e) & (h), and they have been embodied in decisions of the Supreme Court and this Court. The result in this case is that Gilbert must serve the sentence that was imposed on him fourteen years

ago.[22]

**AFFIRMED**.

---

[22]After the panel issued its decision, it ordered Gilbert released from prison immediately. That order, which was issued on July 1, 2010, is rescinded immediately on the date this opinion is issued.

DUBINA, Chief Judge, concurring specially:

Even though I initially agreed with the panel opinion, I now concur fully in the well-reasoned majority opinion and write separately to emphasize that after studying the issue further and having the benefit of en banc oral argument and briefing, I am persuaded that Gilbert's sentencing guidelines claim does not fall within the savings clause of 28 U.S.C. § 2255, and that the policy principles regarding finality of judgment weigh most heavily in denying Gilbert the relief he seeks. As the majority opinion states, "one of the principal functions of AEDPA was to ensure a greater degree of finality for convictions." Johnson v. United States, 340 F.3d 1219, 1224 (11th Cir. 2003). In enacting AEDPA, Congress placed restrictions on the filing of second or successive petitions to ensure the finality of state and federal court judgments. Because the principle of finality of judgment is paramount to our criminal justice system, Gilbert's attempt to circumvent the second or successive motions bar that Congress placed in § 2255(h) cannot succeed. Accordingly, I join the majority in affirming the district court's judgment denying habeas relief.

TJOFLAT, Circuit Judge, concurring, in which EDMONDSON, Circuit Judge, joins:

I fully agree with the court's explanation of why the district court could not grant Gilbert the relief he seeks, but feel obliged to make the following observations.

First, I think it unnecessary to describe in detail the circumstances of Gilbert's crime—including the presence of his five-year old daughter—and Gilbert's criminal record, and then posit that, if he were to be resentenced, the district court would likely impose the same sentence he received in the first instance. None of that is relevant. I therefore do not join in part II.A of the court's opinion. The sole issue we are called upon to decide is whether the savings clause applies in this case. The court holds, correctly, that it does not.

Second, having decided that the savings clause does not apply in this case, we do not need to imagine the potential consequences of a contrary holding. I therefore decline to join part II.B.4 of the court's opinion.

73

PRYOR, Circuit Judge, concurring:

I join fully in the opinion of the majority. I write separately to respond to the dissenting opinions, which argue that this Court is "morally bankrupt," Dissenting Op. of Hill, J., at 104, unless we find some way to read the Suspension Clause creatively or otherwise find a way to hold that Gilbert is entitled to immediate release from prison. The dissents are overwrought for several reasons, but I address only a few flaws that are particularly disturbing.

The dissents argue that Gilbert has not had a "meaningful opportunity" to challenge the legality of his imprisonment, Dissenting Op. of Barkett, J., at 86; Dissenting Op. of Martin, J., at 98 n.3; Dissenting Op. of Hill, J., at 104, but that assertion is silly. To the contrary, the federal judiciary knows Ezell Gilbert well: Gilbert pleaded guilty to drug charges in 1996; he appealed his sentence to this Court, and we affirmed, United States v. Gilbert, 138 F.3d 1371 (11th Cir. 1998); he petitioned for rehearing en banc, but his petition was denied, United States v. Gilbert, 156 F.3d 188 (1998) (unpublished table decision); he petitioned for a writ of certiorari, but that petition was denied too, Gilbert v. United States, 526 U.S. 1111, 119 S. Ct. 1754 (1999); he filed a motion to vacate his sentence, which the district court denied; he tried to appeal this denial, but this Court denied him a certificate of appealability. Gilbert, like all other criminals prosecuted in the

74

United States, has been afforded a panoply of rights, including the right to a jury trial, the right to counsel, and the rights to appeal and to seek postconviction relief.

Several constitutional provisions grant rights to criminals like Gilbert, but the Suspension Clause is not one of them. The Supreme Court explained, shortly after the ratification of the Constitution, that "for the meaning of the term habeas corpus, resort may unquestionably be had to the common law." Ex parte Bollman, 4 Cranch. 75, 93–94 (1807) (Marshall, C.J.). "[A]t common law a judgment of conviction rendered by a court of general criminal jurisdiction was conclusive proof that confinement was legal," United States v. Hayman, 342 U.S. 205, 211, 72 S. Ct. 263, 268 (1952), a fact curiously omitted in the discussion of Hayman in one of the dissenting opinions, Dissenting Op. of Martin, J., at 94. Courts instead "exercised the writ in light of its most basic purpose, avoiding serious abuses of power by a government, say a king's imprisonment of an individual without referring the matter to a court." Lonchar v. Thomas, 517 U.S. 314, 322, 116 S. Ct. 1293, 1298 (1996). Early American habeas legislation protected citizens primarily from arbitrary detention, true to the English Habeas Corpus Act of 1679. See Dallin H. Oaks, Habeas Corpus in the States—1776-1865, 32 U. Chi. L. Rev. 243, 251–52 (1965). That Act empowered judges to order the release of prisoners "other than persons Convict or in Execution." 31 Car. 2, c. 2 § 3. The Judiciary

75

Act of 1789 embodied this limitation. "As limited by the act of 1789, [the writ] did not extend to cases of imprisonment after conviction, under sentences of competent tribunals . . . ." Ex parte Yerger, 75 U.S. 85, 101 (1868). For example, when Tobias Watkins petitioned the Supreme Court for an original writ following his conviction and imprisonment for what he alleged was a non-existent crime, the Court denied his petition in the following terms written by Chief Justice John Marshall: "An imprisonment under a judgment cannot be unlawful, unless that judgment be an absolute nullity; and it is not a nullity if the court has general jurisdiction of the subject, although it should be erroneous." Ex parte Watkins, 28 U.S. 193, 203 (1830). Because no one contends that the district court lacked jurisdiction to sentence Gilbert, he would not be entitled to the writ at common law.

The arguments of my dissenting colleagues that the Suspension Clause entitles Gilbert to relief, Dissenting Op. of Barkett, J., at 86; Dissenting Op. of Martin, J., at 89; Dissenting Op. of Hill, J., at 105, must presume that the Suspension Clause underwent a metamorphosis sometime between 1789 and 2011. The dissents understandably fail to cite any authorities for this position. The Supreme Court has never held that the Suspension Clause protects anything more than the writ as understood in 1789. See Boumediene v. Bush, 553 U.S. 723, 746,

76

128 S. Ct. 2229, 2248 (2008) ("[T]he Court has said that 'at the absolute minimum' the [Suspension] Clause protects the writ as it existed when the Constitution was drafted and ratified.") (quoting INS v. St. Cyr, 533 U.S. 289, 301, 121 S. Ct. 2271, 2279 (2001)); St. Cyr, 533 U.S. at 301, 121 S. Ct. at 2279 ("[A]t the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.'") (quoting Felker v. Turpin, 518 U.S. 651, 663–64, 116 S. Ct. 2333, 2340 (1996)); Felker, 518 U.S. at 663–64, 116 S. Ct. at 2340 ("But we assume, for purposes of decision here, that the Suspension Clause of the Constitution refers to the writ as it exists today, rather than as it existed in 1789."). Two of our sister circuits have concluded that the Suspension Clause protects access to the writ only as it was understood in 1789. The Seventh Circuit held, "What is protected from suspension is the writ that limits a person's detention by the executive branch without trial. There is no constitutional entitlement to post-judgment collateral review by the inferior federal courts, let alone to unending rounds of such review." Benefiel v. Davis, 403 F.3d 825, 827 (7th Cir. 2005) (Easterbrook, J.); see also Lindh v. Murphy, 96 F.3d 856, 867–68 (7th Cir. 1996) (en banc), rev'd on other grounds, 521 U.S. 320, 117 S. Ct. 2059 (1997). The Third Circuit similarly reasoned, "[I]t would appear that the complete denial of the writ of habeas corpus to convicted federal prisoners would not violate the Constitution" because in 1789

77

"habeas corpus was not available to persons convicted of crime to test the legality of their convictions." United States v. Anselmi, 207 F.2d 312, 314 (3d Cir. 1953). Several justices of the Supreme Court have also interpreted the Suspension Clause to protect nothing more than it protected in 1789. See Boumediene, 553 U.S. at 844, 128 S. Ct. at 2303 (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas and Alito, JJ.) ("The nature of the writ of habeas corpus that cannot be suspended must be defined by the common-law writ that was available at the time of the founding."); Swain v. Pressley, 430 U.S. 372, 384, 97 S. Ct. 1224, 1231 (1977) (Burger, C.J., concurring, joined by Blackmun and Rehnquist, JJ.) ("The sweep of the Suspension Clause must be measured by reference to the intention of the Framers and their understanding of what the writ of habeas corpus meant at the time the Constitution was drafted."); D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 471 n.9, 62 S. Ct. 676, 686 n.9 (1942) (Jackson, J., concurring) ("Particularly in the clauses dealing with the rights of the individual, the Constitution uses words and phrases borrowed from the common law, meaningless without that background, and obviously meant to carry their common-law implications. Thus, we find in it . . . 'Privilege of the Writ of habeas Corpus' . . . .").

Because the Suspension Clause does not provide any rights to prisoners convicted and sentenced by courts of competent jurisdiction, any relief that

Congress chooses to provide to federal prisoners is, to borrow language from a dissent, a "gift[] that may be bestowed or withheld." Dissenting Op. of Hill, J., at 104 n.2. And if a federal prisoner suffers some "injustice" that Congress has not empowered the courts to correct, the President can exercise his "Power to grant Reprieves and Pardons." U.S. Const. Art. II, § 2, cl. 1. There is nothing unjust about federal courts not granting relief when the law does not provide a right to relief.

But the dissents fret, what is a judge to do when he or she thinks Congress was not generous enough when it gave prisoners the right to attack collaterally their sentences? The dissents offer an answer: Help Congress and the President with their work. After all, the President may be too busy "with the vast responsibility of exercising executive powers," Dissenting Op. of Martin, J., at 95, and Congress may be too busy with other legislative responsibilities to provide relief to a recidivist serving a federal sentence that is less than the statutory maximum. In the light of the growing national debt, releasing Gilbert from prison may also be a good idea because his incarceration is "very expensive." Id. at 97.

This grandiose conception of judicial supremacy would threaten the separation of powers and undermine the rule of law. The fundamental "role of the courts" is not to "hear [the] cases" presented by prisoners "detained without a

remedy" and give them relief not provided by law. Id. at 101. The Supreme Court has held that, subject to constitutional limitations, rules that govern the application of the writ "reflect a balancing of objectives (sometimes controversial), which is normally for Congress to make, but which courts will make when Congress has not resolved the question." Lonchar, 517 U.S. at 323, 116 S. Ct. at 1298. We do not have to balance competing objectives here because Congress has already done so. Congress chose to deny Gilbert the right to a successive motion to vacate his sentence. The Supreme Court has held that Congress did not violate the Suspension Clause when it imposed this same restriction on petitions filed by state prisoners. Felker, 518 U.S. at 664, 116 S. Ct. at 2340. This undisputed fact should end our inquiry. The argument that "this court sits at the apex of its power to free Mr. Gilbert" because "we do not address a state court conviction here," Dissenting Op. of Martin, J., at 99, disregards the fact that review of Gilbert's sentence would disturb the division of powers between the three branches of the federal government. We neither "shirk[] our duty" nor "diminish the institution of the federal courts," id. at 94, when we respect the separation of powers provided by the Constitution. We instead provide that respect "to the end it may be a government of laws and not of men." Mass. Const. pt. 1, art. XXX. See Morrison v. Olson, 487 U.S. 654, 697, 108 S. Ct. 2597, 2622 (1988) (Scalia, J., dissenting) (explaining

80

the origin of this phrase as tied to the separation of powers).

After charging that this Court is "morally bankrupt" unless it can find a way to do "justice," Dissenting Op. of Hill, J., at 104, Judge Hill's dissent notes that the law sometimes provides relief to individuals as unsympathetic as Gilbert, such as the rapist Ernesto Miranda, id. at 105, but Miranda's victory does not mean that the judiciary must correct every error committed at trial or sentencing years after the sentence has become final. The first citation of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), by the Supreme Court proves the point. Prisoners sentenced to death before 1966, whose confessions were obtained in violation of the rule established in Miranda, were denied relief because, as Justice William Brennan announced for the Court, Miranda did not apply retroactively. Johnson v. New Jersey, 384 U.S. 719, 732, 86 S. Ct. 1772, 1780 (1966); see also Campbell v. Wainwright, 738 F.2d 1573, 1580 (11th Cir. 1984) (Hill, J.) (refusing to apply retroactively a new rule regarding racial discrimination in jury selection).

The denial of Gilbert's petition does not mean that "[t]he Great Writ is dead," Dissenting Op. of Hill, J., at 102. Far from it. The federal judiciary steadfastly has protected the writ and ensured that it remains available to those who would have been entitled to it in 1789. The Supreme Court recently held that the writ is available even to enemy combatants who are captured abroad and detained

81

by the United States at Guantanamo Bay, Cuba. <u>Boumediene</u>, 553 U.S. 723, 128 S. Ct. 2229. The writ is also available to Americans who are captured in a foreign country and detained at a military base operated by an American-led multinational coalition, <u>Munaf v. Geren</u>, 553 U.S. 674, 128 S. Ct. 2207 (2008); to illegal aliens detained in the United States, <u>Clark v. Martinez</u>, 543 U.S. 371, 125 S. Ct. 716 (2005); to a former Panamanian dictator who recently unsuccessfully challenged his extradition to France, <u>Noriega v. Pastrana</u>, 564 F.3d 1290 (11th Cir. 2009); and to convicted sex offenders to challenge their civil commitment, <u>Dutil v. Murphy</u>, 550 F.3d 154 (1st Cir. 2008).

Congress generously has made the writ available to prisoners serving sentences imposed by state and federal courts even though those prisoners would not have been entitled to the writ in 1789. We have entertained thousands of petitions from prisoners sentenced by state and federal courts. The primary effect of the expansion of the availability of the writ beyond the requirements of the Suspension Clause has not been to vindicate the rights of prisoners, but to undermine the finality of judgments. A recent empirical study found that, for most state prisoners, the writ is an illusory remedy as it is granted for only 0.35 percent of petitions filed by state prisoners not sentenced to death. Nancy J. King & Joseph L. Hoffmann, <u>Habeas for the Twenty-First Century</u> 79 (2011). In addition,

state prisoners sentenced to death, but whose guilt is beyond dispute, routinely use postconviction remedies provided by Congress and by state governments to litigate the legality of their sentences for decades following conviction. See, e.g., Harvey v. Warden, Union Corr. Inst., 629 F.3d 1228 (11th Cir. 2011) (challenge to sentence imposed in 1986); Kokal v. Sec'y, Dep't of Corr., 623 F.3d 1331 (11th Cir. 2010) (challenge to sentence imposed in 1984), petition for cert. filed (U.S. Mar. 21, 2011) (No. 10-9693); Puiatti v. McNeil, 626 F.3d 1283 (11th Cir. 2010) (challenge to sentence imposed in 1984), petition for cert. filed (U.S. Apr. 21, 2011) (No. 10-1302). The writ is also available to challenge not only convictions and sentences, but humdrum matters such as the failure to grant early release from prison or the revocation of "good time" credits. See, e.g., Brown v. McFadden, 416 F.3d 1271 (11th Cir. 2005); Medberry v. Crosby, 351 F.3d 1049 (11th Cir. 2003). The above-referenced empirical study found that, of the 2,384 petitions in a sample of petitions filed by state prisoners not sentenced to death, 17.8 percent of the petitions did not challenge the constitutionality of a conviction or a sentence, and none of these petitions were granted. King & Hoffmann, supra, at 154-55.

It is also absurd to assert that we have "render[ed] the savings clause a dead letter." Dissenting Op. of Martin, J., at 93. By operation of the savings clause for motions to vacate, 28 U.S.C. § 2255(e), Congress has allowed federal prisoners to

petition for writs of habeas corpus when a decision of the Supreme Court applies retroactively and "establishes the petitioner was convicted for a nonexistent offense" and circuit precedent prevented the petitioner from raising the issue on direct appeal or in a motion to vacate. Wofford v. Scott, 177 F.3d 1236, 1244 (11th Cir. 1999); see also In re Davenport, 147 F.3d 605, 611 (7th Cir. 1998). In other words, Tobias Watkins's twenty-first century counterpart would be statutorily entitled to the writ.

The dissents trivialize the Great Writ when they argue that it must issue to reverse the sentence of a confessed and recidivist drug dealer, who has already challenged his conviction and sentence both on direct and collateral review, only so that he may be resentenced by a court that could impose a sentence even greater than the one originally imposed. See Schneckloth v. Bustamonte, 412 U.S. 218, 275, 93 S. Ct. 2041, 2072 (1973) (Powell, J., concurring) ("There has been a halo about the 'Great Writ' that no one would wish to dim. Yet one must wonder whether the stretching of its use far beyond any justifiable purpose will not in the end weaken rather than strengthen the writ's vitality."); Brown v. Allen, 344 U.S. 443, 536, 73 S. Ct. 397, 425 (1953) (Jackson, J., concurring) ("[I]t [is] important to adhere to procedures which enable courts readily to distinguish a probable constitutional grievance from a convict's mere gamble on persuading some

indulgent judge to let him out of jail. . . . [We should not] sanction[] progressive trivialization of the writ until floods of stale, frivolous and repetitious petitions inundate the docket of the lower courts and swell our own."). The Great Writ developed in England as a tool to challenge arbitrary detentions by the government that fortunately have rarely been seen in this country. The Framers enshrined the protection of the Great Writ in the Constitution out of awareness of the excesses of British monarchs. An expansive application of the writ is "at odds with the historic meaning of habeas corpus—to afford relief to those whom society has 'grievously wronged.'" Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 1721 (1993).

Judges cannot mold the Suspension Clause to provide relief whenever they feel sorry for a prisoner or to comport with their personal sense of justice, and that fact does not mean that the "Great Writ is dead." Congress allowed prisoners to attack collaterally their sentences, but Congress had every right to restrict second or successive collateral attacks. Gilbert is not entitled to relief.

BARKETT, Circuit Judge, dissenting, in which HILL, Circuit Judge, joins:

I join in full the dissenting opinions authored by Judge Martin and Judge Hill. I write separately to emphasize that 28 U.S.C. § 2255(e) is referred to as the "savings" clause for a reason. By permitting a federal prisoner to bring a habeas corpus petition under 28 U.S.C. § 2241 where § 2255 proves "inadequate or ineffective remedy to test the legality of his detention," § 2255(e) operates to "save" § 2255 from violating the Suspension Clause of the United States Constitution. In a recent landmark decision comprehensively interpreting the Suspension Clause, the Supreme Court squarely held that the Suspension Clause is violated when a prisoner is denied "a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law." Boumediene v. Bush, 553 U.S. 723, 779 (2008).[1] Thus, where the application of the statutory bar in § 2255(h) would deny a federal prisoner such a meaningful opportunity, the savings clause must apply in order to avoid an

_____

[1] Judge Pryor's concurring opinion is premised on the view that the Suspension Clause applies only where a prisoner has been convicted and sentenced by a court of incompetent jurisdiction. That view, however, is not one shared by the Supreme Court. See Boumediene, 553 U.S. at 785 ("Even when the procedures authorizing detention are structurally sound, the Suspension Clause remains applicable and the writ relevant. This is so . . . even where the prisoner is detained after a criminal trial conducted in full accordance with the protections of the Bill of Rights.") (internal citation omitted).

86

unconstitutional suspension of the writ of habeas corpus.[2]  In this case, there can be no dispute that Gilbert, through no fault of his own, has been denied a meaningful opportunity to challenge the legality of his detention.[3]  Because the Constitution guarantees him that opportunity, I believe that the savings clause authorizes him to bring his claim in a habeas corpus petition under § 2241.

---

[2]  Relying on Felker v. Turpin, 518 U.S. 651, 663–64 (1996), the majority suggests that the statutory bar in § 2255(h) is wholly immune from the Suspension Clause.  But the Supreme Court in Felker held only that the analogous statutory bar in 28 U.S.C. § 2244(b)(3) did not violate the Suspension Clause on its face.  Nowhere did the Court suggest, let alone hold, that the statutory bar would not violate the Suspension Clause where its application in a particular case has the egregious effect of denying a prisoner a meaningful opportunity to challenge the legality of his detention.

[3]  Not only does Judge Pryor dispute this point, he deems it "silly."  But every court to review Gilbert's meritorious claim, which he has pursued with diligence, has lacked the authority to correct the legal error he identified.  Judicial review of this sort is vacuous and hollow, not meaningful.  See Boumediene, 553 U.S. at 785 ("Habeas corpus is a collateral process that exists, in Justice Holmes' words, to 'cut through all forms and go to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings, and although every form may have been preserved opens the inquiry whether they have been more than an empty shell.'") (quoting Frank v. Mangum, 237 U.S. 309, 346 (1915) (Holmes, J., dissenting) (alterations omitted).  The denial of such meaningful review is further compounded by the now-undisputed fact that Gilbert was sentenced pursuant to an erroneously-calculated mandatory guideline range that effectively increased his term of imprisonment by at least eight and a half years.  In short, there is nothing silly—and everything solemn—about this case.

MARTIN, Circuit Judge, dissenting, in which BARKETT and HILL, Circuit Judges, join:

Ezell Gilbert is now before us asking to be relieved of the consequences of a mistake we made in his direct appeal in 1998. He told us then that the District Court was wrong in sentencing him substantially more harshly based on that court's decision that carrying a concealed weapon is a crime of violence. We rejected his argument, and affirmed his sentence of more than 24 years. United States v. Gilbert, 138 F.3d 1371 (11th Cir. 1998). We did this on a record containing the District Judge's clear statement that the sentence was longer than he would have imposed, but for the then-mandatory Sentencing Guidelines. Id. at 1372–73. It turns out, of course, that Mr. Gilbert was right and we were wrong. Carrying a concealed weapon is not a crime of violence. We said so, belatedly for Mr. Gilbert, in United States v Archer, 531 F.3d 1347 (11th Cir. 2008).

The effects of our mistake are quite dire for Mr. Gilbert, insofar as his properly calculated (and advisory) guideline range would today be 130–162 months, or approximately 11 to 13 years. As I write this, I understand that he has already served more than fourteen years in prison. And yet the majority opinion tells Mr. Gilbert that the laws and Constitution of this country offer him no relief. I differ with the majority insofar as I believe the statute offers Mr. Gilbert a remedy

88

under these extraordinary circumstances. If, on the other hand, I must accept the majority position that Mr. Gilbert has no statutory remedy, I say that he has been subjected to a deprivation of liberty of such magnitude that, when paired with no possible remedy, we are confronted with a constitutional question that we otherwise need not have reached. That constitutional question is whether the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), as interpreted by the majority, constitutes a suspension of the writ in violation of Article I, § 9, cl. 2 of the United States Constitution.[1] See Boumediene v. Bush, 553 U.S. 723, 779, 128 S. Ct. 2229, 2266 (2008) (recognizing that it is "uncontroversial . . . that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." (quoting I.N.S. v. St. Cyr, 533 U.S. 289, 302, 121 S. Ct. 2271, 2281 (2001))); In re Davenport, 147 F.3d 605 (7th Cir. 1998) (recognizing that a "safety hatch" available when "[28 U.S.C. §] 2255 proved in a particular case not to be an adequate substitute for habeas corpus . . . would block any argument that Congress was suspending the writ").

---

[1]The commonly referred to Suspension Clause of the U.S. Constitution provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2.

In order to more clearly delineate Mr. Gilbert's avenue for relief, it is necessary to review the remedies that are *not* available to him. First, because Mr. Gilbert raised the issue of his career offender enhancement in his direct appeal, and because the Supreme Court had not yet decided Begay v. United States, 553 U.S. 137, 128 S. Ct. 1581 (2008), he was barred from arguing in his first and timely-filed 28 U.S.C. § 2255 petition that carrying a concealed weapon is not a crime of violence. Our precedent clearly forecloses a habeas court from granting collateral relief on a matter raised on direct appeal. United States v. Nyhuis, 211 F.3d 1340, 1343 (11th Cir. 2000) ("[O]nce a matter has been decided adversely to a defendant on direct appeal it cannot be re-litigated in a collateral attack under section 2255.") (quotation marks omitted).

Second, 28 U.S.C. § 2255(h), which was enacted into law as a part of AEDPA, and permits a second or successive petition for relief, is not available to Mr. Gilbert. In order to be eligible to file a second or successive motion for relief under § 2255(h), the statute requires a showing either that (1) there is newly discovered evidence which would, under a strict standard of review, result in no reasonable fact finder finding him guilty of the offense; or (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that had not been previously available. We have held that the "newly

90

discovered evidence" requirement of this statute refers to the offense of conviction, so it cannot be relied upon by someone, like Mr. Gilbert, who is challenging his sentence. See, e.g., In re Dean, 341 F.3d 1247, 1249 (11th Cir. 2003). Also, Begay, 553 U.S. 137, 128 S. Ct. 1581, in which the Supreme Court abrogated our ruling in Mr. Gilbert's direct appeal, Archer, 531 F.3d 1347, dealt with a sentencing issue, and therefore has not been deemed to pronounce a new rule of constitutional law under § 2255(h). This means that Mr. Gilbert, who was *never* a career offender in light of Begay's retroactive application, has no remedy under § 2255(h) even though he will be incarcerated for just short of a quarter century based on a mistaken determination that he was a career offender.

For me, Mr. Gilbert's particular circumstance is addressed by 28 U.S.C. § 2255(e), which was already in existence at the time of AEDPA's passage, and not expressly repealed by it. It is often referred to as the "savings clause" of section 2255, and provides as follows:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

Mr. Gilbert did not fail to apply for relief, but rather has diligently pursued every

legal avenue available to him, including, of course, direct appeal to this Court.

Since Mr. Gilbert still faces a sentence of more than 24 years despite our admission

that we decided his case wrongly, his efforts can only be said to have been of no

effect. Therefore, proceeding under the plain terms of the statute, as we must,

§ 2255 has been both inadequate and ineffective for Mr. Gilbert. See Connecticut

Nat'l Bank v. Germain, 503 U.S. 249, 253–54, 112 S. Ct. 1146, 1149 (1992)

("[C]ourts must presume that a legislature says in a statute what it means and

means in a statute what it says.") Under the statute, therefore, Mr. Gilbert may turn

to 28 U.S.C. § 2241.

Shortly after Mr. Gilbert was convicted, we mentioned the possibility that

relief for a "fundamental defect" in a sentence might be available by way of this

savings clause. Wofford v. Scott, 177 F.3d 1236, 1244–45 (11th Cir. 1999). In

Wofford, we said "the only sentencing claims that may conceivably be covered by

the savings clause are those based upon a retroactively applicable Supreme Court

decision overturning circuit precedent." Id. at 1245. Here, the government has

never disputed that the United States Supreme Court's decision in Begay fits this

description of a "retroactively applicable Supreme Court decision overturning

circuit precedent." Indeed the government could not, because the Supreme Court's

ruling in Begay caused us to overturn circuit precedent, applied in Mr. Gilbert's

direct appeal, that carrying a concealed weapon is a crime of violence.

The majority today forecloses the possibility we left open back in 1999. This decision removes any possibility of habeas relief for Mr. Gilbert by equating the requirements for relief under § 2255(e) with those under § 2255(h) and, in the process, renders the savings clause a dead letter. So now it is true that there is no relief in Alabama, Florida or Georgia for any person who is, for some reason, barred from relief under § 2255 but wrongfully incarcerated on account of a sentencing error. This is so, even here, where that sentencing error leaves him incarcerated for a decade or more beyond what is called for by law.[2]

Requiring a prisoner to meet the requirements of 28 U.S.C. § 2255(h) in order to be eligible for relief under § 2255(e) (and therefore 28 U.S.C. § 2241) raises long recognized constitutional concerns. The writ of habeas corpus is now,

---

[2]I recognize that my estimate of the difference between Mr. Gilbert's current sentence, and what his sentence would be if he were sentenced today makes the generous assumption that the District Judge would again impose a sentence at the low end of the guidelines. My estimate comes from subtracting the number of months which constitute the low end of what we now know to be Mr. Gilbert's correct guideline range from the sentence he is serving. The majority's estimate is much higher. The majority speculates that Mr. Gilbert could be resentenced to 292 months of incarceration or could get an even longer sentence. In order to get to this number the majority has second guessed the charging decisions made by the prosecutor with regard to Mr. Gilbert. This is not permitted by our precedent. United States v. Smith, 231 F.3d 800, 807 (11th Cir. 2000) ("The decision as to which crimes and criminals to prosecute is entrusted by the Constitution not to the judiciary, but to the executive who is charged with seeing that laws are enforced."). Although the answer to the question of how long Mr. Gilbert's sentence would be if he were resentenced has some bearing on the extent of the deprivation for which he is here seeking relief, we can all agree that Mr. Gilbert has already been incarcerated for a period well beyond the top of today's accurate guideline range for the charge of which he was convicted in this case.

and has been since the beginning, fundamental to our system of justice. We know that the "[p]ower to issue the writ of habeas corpus, the most celebrated writ in the English law, was granted to the federal courts in the Judiciary Act of 1789." United States v. Hayman, 342 U.S. 205, 210, 72 S. Ct. 263, 268 (1952) (quotation marks and citations omitted). In Hayman, the United States Supreme Court reviewed the reasons for passage of 28 U.S.C. § 2255 and evaluated the then new statute as well. Id. at 210–22, 72 S. Ct. at 268–74. The Court recognized the role of 28 U.S.C. § 2241 for those cases in which § 2255 cannot provide relief, stating "[i]n a case where the Section 2255 procedure is shown to be 'inadequate or ineffective,' the Section provides that the habeas corpus remedy [§ 2241] shall remain open to afford the necessary hearing." Id. at 223, 72 S. Ct. at 274.

While the Hayman court was addressing § 2255 well before the enactment of the AEDPA amendments, I am aware of no development in the decades that have passed since the ruling in Hayman, including the passage of AEDPA, that was intended to remove the power and responsibility of the judiciary to enforce § 2241. Our duty to interpret that provision according to its plain terms is especially robust in light of the Suspension Clause of the U.S. Constitution. By today's decision we have shirked our duty in that regard, and in doing so we diminish the institution of the federal courts.

As if to highlight the harm we do to the court, during oral argument the government stated that the only possible avenue of recourse for Mr. Gilbert is to seek clemency from the Executive Branch of government. Surely we neglect our responsibility when we turn away a wrongfully incarcerated defendant with the suggestion that he seek relief from the branch already charged with the vast responsibility of exercising executive powers. The responsibility for assuring individual justice is ours.

The plain text of § 2255(e) permits Mr. Gilbert to petition for habeas corpus through a § 2241 motion. My application of the majority's own analysis leads to this conclusion as well.

a. <u>Statutory Construction</u>

In construing the enactment of 28 U.S.C. § 2255(h) to deplete the importance of the previously existing § 2255(e) the majority says: "[f]undamental canons of statutory construction support the conclusion that the generally worded and ambiguous savings clause, which was first enacted in 1947, cannot override the specifically worded and clear statutory bar on second or successive motions that was enacted as part of AEDPA in 1996." Maj. Op. at 34. This ignores another fundamental canon of statutory construction, recognized by the Supreme Court in the very case relied upon by the majority, which disfavors repeal of a statute by

95

implication.  Morton v. Mancari, 417 U.S. 535, 549–50, 94 S. Ct. 2474, 2482 (1974); see Maj. Op. at 34.  Indeed, the Supreme Court has expressly declined to find that certain AEDPA amendments repealed 28 U.S.C. § 2241 by implication. Felker v. Turpin, 518 U.S. 651, 661, 116 S. Ct. 2333, 2339 (1996).  And yet, the majority effectively comes to that result here.  By grafting the requirements of § 2255(h) onto the savings clause, the majority has stripped that clause of any independent meaning.  Such a result flies in the face of Congress's deliberate choice to leave the savings clause intact when passing AEDPA.

b. Finality

In this case of statutory construction, the majority also speaks of the importance of finality.  Surely Mr. Gilbert's case is a poor vehicle to promote the idea that finality builds confidence in our criminal justice system.  Today we tell a man he must sit in the penitentiary for years beyond the sentence that a proper application of the law would have imposed, when we rejected his correct interpretation of what the law meant back in 1998.

Finality is valued in our system insofar as it promotes certain principles: (1) to build confidence in the integrity of the judicial system; (2) to minimize administrative costs and delay; (3) to avoid spoilation of evidence; and (4) to honor comity.  See United States v. Addonizio, 442 U.S. 178, 184 n.11, 99 S. Ct. 2235,

96

2240 n.11 (1979); see also Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441, 451–53 (1962). We advance none of these principles by denying Mr. Gilbert relief here.

First, denying relief does not build confidence in our court system because this looks to the world like a court refusing to acknowledge or make amends for its own mistake. Second, to the extent that there have been administrative costs and delay in considering Mr. Gilbert's request for relief, they have already been incurred, and we need only grant him that relief to end his very expensive incarceration. Third, because the only issue before us is a purely legal one, there is no evidence we must consult. Thus spoilation is not a concern. And finally, Mr. Gilbert's case presents no comity concerns insofar as he seeks to correct a sentence imposed in federal court and not by the state.

It is worth pausing briefly to properly emphasize that this case does not raise comity concerns because we are asked to correct a mistake we ourselves made in federal court. We are not reviewing a state court conviction which would require our deference. To be sure, AEDPA was designed "to further the principles of comity, finality, and federalism." Williams v. Taylor, 529 U.S. 420, 436, 120 S. Ct. 1479, 1491 (2000); accord Miller-El v. Cockrell, 537 U.S. 322, 337, 123 S. Ct. 1029, 1040 (2003). As the Supreme Court has recognized, however, finality is

97

most important when federal courts are reviewing state court as opposed to federal

court convictions:

> Finality has special importance in the context of a federal attack on a state conviction. Reexamination of state convictions on federal habeas frustrate[s] . . . both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights. Our federal system recognizes the independent power of a State to articulate societal norms through criminal law; but the power of the State to pass laws means little if the State cannot enforce them.

McCleskey v. Zant, 499 U.S. 467, 480, 111 S. Ct. 1454, 1469 (1991) (quotation

marks and citations omitted). AEDPA codified the previously existing procedures

which placed limits on the power of federal courts to grant writs of habeas corpus

to state prisoners. Miller-El, 537 U.S. at 337, 123 S. Ct. at 1039–40; Williams v

Taylor, 529 U.S. 362, 380 n.11, 120 S. Ct. 1495, 1506 n.11 (2000). Giving life to

this limit on federal courts where state convictions are concerned, the abuse of the

writ doctrine was codified in 28 U.S.C. § 2254, which governs those in custody

"pursuant to the judgment of a State Court." See Williams, 529 U.S. at 380 n.11,

120 S. Ct. at 1495 n.11 (discussing codification of "abuse of the writ doctrine

applied in Sanders v. United States, 373 U.S. 1, 83 S. Ct. 1068 (1963)").[3] Because

---

[3]As the Supreme Court explained in Felker, the "abuse of the writ" doctrine constitutes "a modified res judicata rule." 518 U.S. at 664, 116 S. Ct. at 2340. But abuse of the writ principles do not properly come into play here, because Mr. Gilbert has not abused the writ. To the contrary, he has never once had "a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." Boumediene, 553 U.S. at 779, 128 S. Ct. at 2266.

we do not address a state court conviction here, this court sits at the apex of its power to free Mr. Gilbert from his unlawful detention, and yet we have declined to do so.

c. Jurisprudence from Other Circuits

The majority states categorically that every other circuit court has refused to interpret the savings clause (28 U.S.C. § 2255(e)) "in a way that would drop the §2255(h) bar on second and successive motions." Maj. Op. at 33–34. Such a definitive statement is not accurate for two reasons. First, the Second and Seventh Circuits have left the question open. Second, no other court has addressed this legal question in the context of facts which carry the magnitude of the impact this case has on Mr. Gilbert. I do agree with the majority that the Third, Fifth and Sixth Circuits have either denied the relief which Mr. Gilbert seeks here, or at least strongly indicated that such relief is not available. For that reason, I will elaborate only on the opinions from the Second and Seventh Circuits.

In Triestman v. United States, 124 F.3d 361 (2d Cir. 1997), that court did wade into the meaning of the "inadequate or ineffective" language of 28 U.S.C. § 2255(e). The court said:

> We have already stated that 'inadequate or ineffective' is not limited merely to the practical considerations suggested by the government, but refers to something that is still less than the full set of cases in which § 2255 is either unavailable or unsuccessful. We now hold that

99

that 'something' is, at the least, the set of cases in which the petitioner cannot, for whatever reason, utilize § 2255, and in which the failure to allow for collateral review would raise serious constitutional questions.

Id. at 377. In contrast to the majority's reading of this case, I do not read it to foreclose relief to Mr. Gilbert. Surely it must be true that keeping someone in the penitentiary for such a substantial duration beyond what the correct sentence would call for constitutes a "serious constitutional question."

I also see the Seventh Circuit's opinion in Davenport, 147 F.3d 605, as favorable to Mr. Gilbert. The majority characterizes Davenport as rejecting the argument that a defendant may assert a § 2241 claim when the procedural hurdles of § 2255 bar a second or successive motion. Maj. Op. at 33, 46–49. I agree with this characterization, as far as it goes. But the Davenport court said more. The court concluded that "[a] federal prisoner should be permitted to seek habeas corpus only if he had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction *or sentence* because the law changed after his first 2255 motion." Id. at 611 (emphasis added). Because Mr. Gilbert has never had a "reasonable opportunity" to obtain a judicial correction of such a fundamental defect, it may well be that he would prevail in the Seventh Circuit. At the very least, I do not think it accurate to say the possibility for relief has been foreclosed to Mr. Gilbert, or someone similarly situated, whose case arose in the

100

Seventh Circuit.

While we may be enriched by the consideration our sister circuits have given to the substantial legal issues we consider here, the decision in Mr. Gilbert's case is ours. For the reasons set out above, I see no impediment imposed by statute or legal precedent which prevents this court from correcting the mistake we made in Mr. Gilbert's case so long ago. To the contrary, I see it as our duty to do so.

Finally, I do not share the majority's concern that giving Mr. Gilbert relief under these extraordinary circumstances will open the floodgates to other prisoners. Indeed if there are others who are wrongfully detained without a remedy, we should devote the time and incur the expense to hear their cases. What is the role of the courts, if not this? But what is important today is the consequence to Mr. Gilbert of our unwillingness to correct our past legal error.

For these reasons I respectfully dissent. I would vacate Mr. Gilbert's sentence and remand his case to the District Court so that he can be resentenced with the law correctly applied.

HILL, Circuit Judge, dissenting, in which BARKETT, Circuit Judge, joins:

Ezell Gilbert's sentence was enhanced by eight and one-half years as the result of his being found by the district court – reluctantly and at the explicit urging of the government – to be a career offender. Ezell Gilbert is not now, *nor has he ever been*, a career offender. The Supreme Court says so.

Today, this court holds that we may not remedy such a sentencing error. This shocking result – urged by a department of the United States that calls itself, without a trace of irony, the Department of Justice – and accepted by a court that emasculates itself by adopting such a rule of judicial impotency – confirms what I have long feared. The Great Writ is dead in this country.

Gilbert raised his claim of sentencing error to every court he could, every chance he got. No court correctly resolved his claim until the Supreme Court made clear that Gilbert's claim was meritorious – he was never a career offender. Now, he has come back to us for relief from his illegal confinement. Our response to him is that he cannot apply for relief under § 2255 because he has done so before, and, although we erroneously rejected his claim, the statute does not permit such reapplication. Of course, had he not applied for § 2255 relief, we would be holding now that he had procedurally defaulted his claim by failing to raise it before.

This "Catch-22" approach to sentencing claims is nothing more than a

102

judicial "gotcha." Through our self-imposed limitations, we have found a way to deny virtually all sentencing claims. We do this, avowedly, in the pursuit of "finality." But, in so doing, we cast a pall of unconstitutionality over the otherwise beneficial provisions of § 2255.

Furthermore, to "seal the deal" on finality, we hold today that even the savings clause of § 2255 – which appears to permit resort to the Great Writ itself in circumstances such as these – provides no avenue to relief for Gilbert because confinement pursuant to sentencing errors such as his does not offend the Constitution. Rather than acknowledging that Gilbert's sentence is fundamentally defective and a miscarriage of justice, we hold that the error resulting in an additional eight and one-half years of prison time for Gilbert is a mere technicality, a misapplication of the Guidelines that has no remedy because it is not all that important. Gilbert's erroneous enhancement as a career offender – demanded by the government at the time – is argued to be mere harmless error now that he has been proven right.[1]

---

[1] I refer the reader to the original panel opinion, now vacated but originally published at 609 F. 3d 1159, which recounts the district court's *sua sponte* effort to remedy the sentencing error in Gilbert's case, saying:

> Unfortunately, Mr. Gilbert is in the unenviable position of having to remain in prison even though under the present interpretation of the law he is no longer deemed a career offender and has served the time that would be required of him were he sentenced today. Salt to the wound is that he legally challenged the very issue that now incarcerates him – but lost. It is faint justice to tell him now that he was right but there is no legal remedy. Having exhausted all avenues know to

The government even has the temerity to argue that the Sentencing Guidelines enjoy some sort of legal immunity from claims of error because they are not statutes at all, but mere policy suggestions. And the majority appears not to understand that Gilbert's imprisonment – no matter how his sentence was calculated – is the act of the Sovereign, who is forbidden by our Constitution to deprive a citizen of his liberty in violation of the laws of the United States.[2]

I recognize that without finality there can be no justice. But it is equally true that, without justice, finality is nothing more than a bureaucratic achievement. Case closed. Move on to the next. Finality with justice is achieved only when the imprisoned has had a meaningful opportunity for a reliable judicial determination of his claim. Gilbert has never had this opportunity.

A judicial system that values finality over justice is morally bankrupt. That is why Congress provided in § 2255 an avenue to relief in circumstances just such as these. For this court to hold that it is without the power to provide relief to a citizen that the Sovereign seeks to confine illegally for eight and one-half years is to adopt a posture of judicial impotency that is shocking in a country that has

the court, the Court determines that at this time it is unable to provide relief to Mr. Gilbert under the law as it currently exists.

[2]The government's suggestion, at *en banc*, that an application for clemency by Gilbert might be favorably received by the government mocks our constitutional guarantees by implying that they are gifts that may be bestowed or withheld at the whim of the Sovereign.

enshrined the Great Writ in its Constitution.  Surely, the Great Writ cannot be so moribund, so shackled by the procedural requirements of rigid gatekeeping, that it does not afford review of Gilbert's claim.

Much is made of the "floodgates" that will open should the court exercise its authority to remedy the mistake made by us in Gilbert's sentence.  The government hints that there are many others in Gilbert's position – sitting in prison serving sentences that were illegally imposed.  We used to call such systems "gulags." Now, apparently, we call them the United States.

One last thought.  The majority spends an enormous amount of time arguing that Gilbert is not a nice man.  Perhaps.  But neither, I expect, was Clarence Gideon, the burglar, or Ernesto Miranda, the rapist.  The Supreme Court managed to ignore this legal irrelevancy in upholding the constitutional principle under attack in those cases.  Would that we could have also.

I respectfully dissent from the majority's holding.  With the addition of these thoughts of my own, I join in both Judge Barkett's and Judge Martin's dissents.